## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **FOXFIELD VILLA ASSOCIATES, LLC** | |
| **ERNEST J. STRAUB, III** | |
| **and** | |
| **RICHARD A. BARTLETT** | |
| **Plaintiffs,** | |
| **v.** | |
| **ROBERT D. REGNIER,** | |
| **BANK OF BLUE VALLEY,** | |
| **BLUE VALLEY BAN CORP.,** | |
| **DONALD H. ALEXANDER,** | **Case No.** 12-2528 CM/JPO |
| **HARVEY S. BODKER,** | |
| **SUZANNE E. DOTSON,** | |
| **CHARLES S. HUNTER,** | |
| **RICHARD L. BOND,** | |
| **MICHAEL J. BROWN,** | |
| **ROBERT D. TAYLOR,** | |
| **THOMAS A. MCDONNELL,** | |
| **and** | |
| **ANNE D. ST. PETER** | |
| **Defendants.** | |

## <u>COMPLAINT</u>

1

*Foxfield Villa Associates, LLC, et al. v. Bank of Blue Valley, et al.*
Complaint

Foxfield Villa Associates, LLC ("Foxfield Villa"), Richard A. Bartlett ("Richard Bartlett"), and Ernest J. Straub, III ("Ernest Straub") (hereafter sometimes collectively referred to as the "Foxfield Villa Parties") for their Complaint against Bank of Blue Valley (hereafter "Bank of Blue Valley" and/or "Bank"), Blue Valley Ban Corp. ("Blue Valley Ban Corp."), Robert D. Regnier ("Regnier"), Donald H. Alexander ("Alexander"), Harvey S. Bodker ("Bodker"), Suzanne E. Dotson ("Dotson"), Charles S. Hunter ("Hunter"), Richard L. Bond ("Bond"), Michael J. Brown ("Brown"), Robert D. Taylor ("Taylor"), Thomas A. McDonnell ("McDonnell"), and Ann D. St. Peter ("St. Peter") (Bank of Blue Valley, Blue Valley Ban Corp., Regnier, Alexander, Bodker, Dotson, Hunter, Bond, Brown, McDonnell, and St. Peter are sometimes hereafter collectively referred to as "Defendants") state:

## PARTIES, JURISDICTION AND VENUE

1. Foxfield Villa Associates, LLC ("Foxfield Villa") is a Kansas limited liability Company, organized and authorized to conduct business in and under the laws of the State of Kansas.

2. Richard Bartlett is a Kansas resident.

3. Ernest Straub is a Kansas resident.

4. Upon information and belief Defendant Bank of Blue Valley (hereafter sometimes "Bank" which term includes the officers and directors acting in their individual capacity and on behalf of the Bank) is a Kansas Banking organization, with a principal place of business in Kansas.

5.      Upon information and belief Defendant Blue Valley Ban Corp. ("Ban Corp.") is a Kansas Corporation with a principal place of business in Kansas.

6.      Upon information and belief Bank of Blue Valley is a wholly owned subsidiary of Ban Corp.

7.      Upon information and belief Defendant Robert D. Regnier is the President, Chief Executive Officer and Chairman of the Board of Directors of Ban Corp. Mr. Regnier is also the Chief Executive Officer and Chairman of the Board of Directors of Bank of Blue Valley.

8.      Upon information and belief Defendant Donald H. Alexander was a Director of Ban Corp. and Bank of Blue Valley in 2007, 2008, 2009, and 2010.

9.      Upon information and belief Defendant Harvey S. Bodker was a Director of Bank of Blue Valley in 2007, 2008, 2009, and 2010.

10.     Upon information and belief Defendant Suzanne E. Dotson was a Director of Bank of Blue Valley in 2007, 2008, 2009, and 2010.

11.     Upon information and belief Defendant Charles S. Hunter was a Director of Bank of Blue Valley in 2007, 2008, 2009, and 2010.

12.     Upon information and belief Defendant Richard L. Bond was a Director of Bank of Blue Valley in 2007, 2008, 2009, and 2010.

13.     Upon information and belief Defendant Michael J. Brown was a Director of Ban Corp. in 2007, 2008, 2009, and 2010.

14.     Upon information and belief Defendant Robert D. Taylor was a Director of

Ban Corp. in 2007, 2008, 2009, and 2010.

15.     Upon information and belief Defendant Thomas A. McDonnell was a Director of Ban Corp. in 2007 and 2008.

16.     Upon information and belief Defendant Anne D. St. Peter was a Director of Ban Corp. in 2007, 2008, and 2009.

17.     Jurisdiction is proper pursuant to 28 U.S.C. § 1331 in that a claim arises under the laws of the United States.

18.     Venue in this action is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in the District of Kansas.  Additionally, a substantial part of property that is subject of the action is located in the District of Kansas.

## INTRODUCTION AND BACKGROUND

19.     During 2007, 2008 and 2009, Bank of Blue Valley loan officers including Bob Regnier, Ralph Schramp and Ed Herman recruited and solicited Rich Bartlett and Ernie Straub to participate in troubled loans owned by the Bank of Blue Valley.

20.     Those troubled loans included loans that the Bank had made on real estate developments in Olathe, Shawnee and Gardner, Kansas among others.

21.     During this recruitment process, Ed Herman and Ralph Schramp, at the consent and direction of the Bank's management including Regnier, communicated to existing customers of the Bank in 2008 and 2009 that Bartlett had recently sold a business and was "flush" with cash.

22.     Accordingly, the Bank pursued Bartlett and presented "investment opportunities" in real estate deals where the Bank knew the loans were in trouble.

23.     Part of the recruitment process specifically directed at Bartlett, Straub and others involved the Bank's officers and directors including Regnier requesting participation in these transactions including without limitation direct efforts by the Bank where the Bank officers invited Mr. Bartlett to luncheons with loan officers.

24.     The lunch meetings included Herman and Schramp and existing customers to discuss the desirability of investments by Bartlett in those transactions.

25.     These efforts by Bank officers not only occurred with Bartlett, but also occurred with other potential investors that the Bank solicited to participate in transactions where the Bank had loans that were in trouble.

26.     There were a number of customers that the Bank threatened in 2008 and 2009 that if the customers did not find outside investors to invest cash into these troubled real estate transactions, then the Bank would foreclose on the properties and pursue claims on guaranties for amounts claimed by the Bank.

27.     This was all part of a larger scheme by the Bank to mitigate the enormous losses the Bank was facing on its real estate loan portfolio.

28.     In fact, the Bank's very existence hinged on the success of these efforts to salvage part of the Bank's loan portfolio.

29.     For example, the Bank was well aware of the fact that the office of the Comptroller of the Currency had published directives in January 2008 that banks with

excessive concentrations in real estate loans would be directed by regulators to reduce those real estate concentrations.

30.     Regnier was well aware of the fact that Federal Regulators including the FDIC announced guidelines in January 2008 that prohibited banks from having a loan portfolio that "had more than 100 percent of its capital in real estate loans" and that the Bank had a heavy real estate loan concentration.

31.     John Dugan, the Comptroller of Currency commented in a public statement on January 31, 2008  on the "challenges we face – both community banks and the OCC – from the intersection of two inescapable facts:  significant community banking concentrations in commercial real estate loans, and the declining quality of a number of these loans, especially those related to residential construction and development."

32.     Mr. Dugan added:  "It's a first principle of sound banking and bank examinations that, the higher a bank's concentration in a particular category of loans, the greater the risk that losses from that asset class will affect the financial soundness of the bank."

33.     Dugan went on to say "[t]he combination of these conditions is putting considerable stress on one particular category of commercial real estate lending:  residential construction and development … ."

34.     Mr. Dugan further commented in his remarks that "[t]here will be more criticized assets; increases to loan loss reserves; and more problem banks.  And yes, there will be an increase in bank failures."

35.     Mr. Dugan cautioned in his remarks to bankers that "it will almost certainly require you to downgrade more of your assets, increase loan loss provisions, and reassess the adequacy of bank capital."

36.     Mr. Dugan stressed that the common goal between the OCC and the banks was to "make sure that banks remain safe and sound so you can continue to meet the needs of your customers." "Over a third of the nation's community banks have commercial real estate concentrations exceeding 300 percent of their capital, and almost 30 percent have construction and development loans exceeding 100 percent of capital."

37.     In 2008, the Bank of Blue Valley had real estate loans totaling over $465,000,000 which was over 600 percent of the Bank's capital at the end of 2007.

38.     The fact is that the Bank of Blue Valley had grown rapidly by making real estate loans.

39.     Moreover, the Bank's "heavy real estate" concentration and the losses related to these bad real estate loans have been devastating on the Bank's financial condition.

40.     The Bank has lost $38,357,000 from 2008 through 2011 – nearly $10.0 million per year.

*Foxfield Villa Associates, LLC, et al. v. Bank of Blue Valley, et al.*
Complaint

41.     The risk of these unprecedented losses is precisely the warning that was trumpeted by regulators in early 2008.

42.     The Bank of Blue Valley knew what was on the horizon and took measures to mitigate these losses by inducing Bartlett, Straub and others into investing in what the Bank knew were bad real estate developments.

43.     As a direct result of the Bank's poor real estate loan performance, in the last six months of 2008, the Bank lost approximately $13.8 Million.

44.     As of September 30, 2008, the total equity in the Bank was only $53.7 Million.

45.     At one point in 2008, the Bank had roughly $550 Million in commercial loans that were secured by commercial and residential real estate developments and risky leases; a mere five (5%) percent write down in these risky loans could result in roughly $27.5 Million in losses.

46.     The Bank also made loans to its shareholders of roughly $24.8 Million, comprising roughly one-half of the shareholder's equity in the Bank.

47.     The Bank acknowledged in 2008 public filings that its assets are troubled and that "deteriorating commercial credit and continued decline in the credit quality of the real estate and construction loan portfolio" have resulted in losses to the Bank.

48.     Moreover, the Bank "charge[d] down $9.7 Million in non-performing loans to account for these impaired loans" in the third quarter of 2008 alone.

49.     The Bank acknowledged in public filings that "[i]f the level of non-performing assets do not decrease, [the Bank is] likely to be under increased regulatory scrutiny, which may include enforcement actions against [the Bank]".

50.     According to the President of the Bank, Robert Regnier, the Bank was trying to raise $6 Million from existing shareholders in the fall of 2008 which had been delayed.

51.     In fact, the subscription to the shareholders expired on November 10, 2008, without the requested capital being raised by the Bank.

52.     The reluctance of investors to place capital in the Bank is evidenced by the magnitude of the losses given the fact that the Bank's capital at this time was only $53.7 million as reported in public filings.

53.     Interestingly enough, the Bank had made "loans to the executive officers and directors of the Bank" in the amount of approximately $24.8 Million which represented forty-six (46%) percent of the stockholder's equity.

54.     Thus, roughly one-half of the Shareholder's collective investment in the Bank was loaned back to the same collective group of shareholders.

55.     The Bank's dire financial condition has been a matter of public record, and in order to mitigate its abysmal drain on capital, the Bank received $21.75 million in TARP funds which Regnier explained provided the Bank with "a lot more muscle to do things when the time was right".

56.     The TARP funds essentially offset the shareholders' need to raise private capital which they were unsuccessful in doing.

57.     According to Regnier, the Bank was attempting to "reduce the Bank's exposure to real estate loans" in 2008 and 2009.

58.     It has been reported that many banks received federal TARP funds, but have yet to repay those monies.  Bank of Blue Valley is one of these banks.

59.     Despite stress from the federal government, Bank of Blue Valley has failed to make scheduled payments on approximately $21.75 million in TARP funds.

60.     As part of the Bank's overall strategy to reduce its exposure to real estate loans it undertook an aggressive strategy to recruit investors to financially support loans that the Bank knew would cause massive losses to the Bank in the event the Bank exercised its rights against the current developers and guarantors.

61.     For example, the Bank unleashed its officers on unsuspecting investors such as Mr. Bartlett and Mr. Straub.

62.     As part of the Bank's overall strategy to recruit "new" investors to support the failing and poorly underwritten loans already on the Bank's books, the Bank induced Mr. Bartlett and Mr. Straub to invest monies in real estate transactions that the Bank had already determined were at substantial risk of loss for the Bank.

63.     As part of the Bank's strategy to entice these investors to support the Bank's stressed and underwater loan portfolio, the Bank intentionally induced investors

with false statements concerning the attractiveness of the real estate projects that the Bank already knew had been losers.

64.     As part of this overall strategy by the Bank, officers such as Ed Herman and Ralph Schramp approached investors like Mr. Bartlett to invest in real estate transactions for their existing customers in Shawnee and Gardner, Kansas in addition to those sought out for Mr. Robben's failed developments.

65.     As part of the strategy, the Bank made recommendations to potential investors such as Mr. Bartlett and Mr. Straub concerning the attractiveness of these investments and the returns that could be obtained.

66.     By way of example, Regnier met with Mr. Bartlett and Mr. Robben in Mr. Regnier's office and sat around Mr. Regnier's table.

67.     During these meetings, Mr. Regnier made false statements to Mr. Bartlett in the presence of Mr. Robben concerning the attractiveness of these investments.

68.     Specifically, Mr. Regnier identified the credibility and successes of Mr. Robben in the multi-family real estate development business.

69.     Moreover, as Mr. Robben presented pro forma financial statements during the meeting and discussed "guaranteed" returns for Mr. Bartlett on his investment, Mr. Regnier sat by knowing that the information regarding "guaranteed" returns was false and knowing that the Bank had substantial information in its own files concerning the financial failure of the project that Mr. Robben was suggesting that Mr. Bartlett invest in.

70.     Mr. Regnier never uttered a word regarding any of the failures of the projects that he and the Bank had knowledge of during the course of the meeting, but instead trumpeted Robben as a successful developer.

71.     Specifically, the Bank failed to disclose when it approached Mr. Straub and Mr. Bartlett about investing in the Foxfield Project in 2007 and 2008 that its loan to Foxfield Associates, LLC ("Foxfield Associates") was in default on the real estate project in Olathe, Kansas (hereafter the "Foxfield Project").

72.     The Bank and Bob Regnier failed to disclose at that time that it classified the Foxfield Associates loan with a risk rating of "8-Doubtful," meaning that collection or liquidation of the full amount of the loan was highly questionable and improbable.

73.     The Bank and Bob Regnier further failed to disclose at that time that it classified the Foxfield Associates loan as a "nonaccrual loan" and as "substandard."

74.     The Bank and Bob Regnier additionally failed to disclose at that time that the original loan to Woodstone, Inc. on the project was in default from its inception and late charges had been charged each month.

75.     The Bank and Bob Regnier never disclosed that the Bank considered all of Mr. Robben's loan transactions with the Bank to be in a "workout" in late 2007 and early 2008 because they were in default.

76.     The Bank's "total workout strategy" with Robben in 2007 and 2008 involved Robben's guaranty of over $7,200,000 in loans with Bank of Blue Valley.

77.     The proposed loan transaction was an "exception" to the Bank's loan policy, which the Bank justified in part because it was a "workout."

78.     The Bank and Bob Regnier failed to disclose that it planned to foreclose on the Foxfield Villa loan if Mr. Robben and the Bank did not find additional investors.

79.     The Bank and Bob Regnier sought Straub and Bartlett to take part in a "new ownership" group that it could pursue when the project continued its unsuccessful track record.

80.     The Bank and Bob Regnier never disclosed that various subcontractors for the Foxfield project had not been paid for work completed prior to Straub and Bartlett signing the loan documents, and that loan proceeds were used to pay certain debts to subcontractors.

81.     Finally, the Bank and Bob Regnier never disclosed that as of December 31, 2007, retained earnings and net income for Foxfield Associates totaled a negative $707,412.75, and that net income for Foxfield Associates in 2008 totaled a negative $121,444.51.

82.     The Bank and Bob Regnier possessed all of this financial information regarding the performance of Foxfield Associates prior to March 24, 2008, but failed to disclose its unsuccessful track record to Mr. Bartlett or Mr. Straub, but instead promoted Robben as a successful and profitable developer.

83.     The Bank and Bob Regnier failed to disclose that Robben was the only guarantor of $3,887,000 in debt related to Foxfield Associates financed by Bank of Blue Valley.

84.     The Bank and Bob Regnier knew, but failed to disclose that Michael T. Vielhauer ("Vielhauer"), Robert T. Kenney, and Robert T. Kenney II (the "Kenneys") refused to guaranty the indebtedness despite collectively owning ninety percent (90%) of the project, and that Robben therefore guaranteed all of the debt despite only owning ten percent (10%) of the project through Woodstone, Inc.

85.     At no time during any of the discussions or meetings prior to closing the transaction did the Bank or Bob Regnier ever indicate to Bartlett or Straub that the Robben Guaranty was of little or no value, even though the Bank knew that Robben's personal guaranty was supported by only $12,500 in liquid cash.

86.     The Bank and Bob Regnier knew and failed to disclose that Robben provided "no guarantor strength."

***The Fall of 2007 – The Bank Concludes that the Foxfield Project is a financial disaster and pressures Paul Robben to find new investors.***

87.     Paul Robben was the only guarantor on the debts for Foxfield Associates, the developer of the Foxfield Project from its inception, in part because all of the cash that was infused in the Foxfield Project was invested by the other investors, namely Mr. Vielhauer and the Kenneys.

88.     In 2008 when the Bank and Robben were proposing a new financial structure for the Foxfield Project, no such structure was even offered to Mr. Bartlett or

*Foxfield Villa Associates, LLC, et al. v. Bank of Blue Valley, et al.*
Complaint

Mr. Straub whereby Paul Robben would be the only guarantor on the transactions if Bartlett and Straub put up the cash, because the Bank knew that when the restructured financing ultimately failed, that Robben could not pay on his guaranty.

89.     In fact, to date the Bank has never made demand on Robben to pay any money on his guaranties.

90.     Moreover, according to Robben, Vielhauer and the Kenneys were not willing to put any more money into the Foxfield Project regardless of how it was going to be developed after the fall of 2007.

91.     The Foxfield Associates Loan with Bank of Blue Valley was in default from the early fall of 2007 until the transaction closed in March of 2008 with Straub and Bartlett as the new Guarantors.

92.     During that period of time, default interest and fees charged by the Bank were added to the loan amount that the Bank and Robben planned to include as part of the payoff to the Bank which Straub and Bartlett would guaranty even though Straub and Bartlett had nothing to do with the Foxfield Project when the default interest and fees were incurred.

93.     At no time did the Bank or Robben ever tell Bartlett or Straub that part of the payoff number that they were financing was to pay the delinquent interest that Robben and his former partners had failed to pay the Bank of Blue Valley.

94.     Moreover, Robben understood that the Bank of Blue Valley generally wanted to have an 80% Loan-to-Value loan transaction on the Foxfield Project in the fall of 2007.

95.     In the fall of 2007, Robben understood that the Bank of Blue Valley had an appraisal conducted on the Foxfield Project which showed that the 9.1 acres that he was proposing to sell to the new entity formed with Bartlett and Straub was worth one-half of what the Bank received as a payoff later in March, 2008.

96.     For example, the Bank understood in the fall of 2007 that the appraised value of the 9.1 acres was roughly $500,000 which was substantially less than even the Bank's first proposed payoff of $850,000.00 to the new entity formed with Bartlett and Straub.

97.     The fact is that the issues concerning the inadequacy of the collateral for the Foxfield Associates loan arose in the fall of 2007 when according to Robben, Ed Herman came to him and said, "We've got a problem, we need to do something;" Ed Herman at that time identified the problem in part was that the interest was not current and that Foxfield Associates needed to discuss a capital call with the original investors, Mr. Vielhauer and the Kenneys.

98.     According to Robben, he told Vielhauer and the Kenneys that they had a problem because the appraisal which Robben delivered to Mr. Vielhauer and the Kenneys showed that the collateral appraised by an appraiser hired by the Bank only

appraised for $3.15 million which was approximately $700,000.00 less than the loan amount of $3.85 million.

99.     Robben understood, based upon communications and interactions with the Bank that there was a substantial problem with the Bank in that there was a substantial collateral deficiency because the collateral was appraised at a significantly lower value than the current amount of the debt in the fall of 2007.

100.    Robben knew that if the Bank were to take the new appraised value and multiply that times 65% Loan-to-Value for raw land and 75% Loan-to-Value for finished lots that there was going to be a substantial issue with the Bank on the collateral values and the shortfall in the loan as it stood in the fall of 2007.

101.    When Robben went back to the partners, Vielhauer and the Kenneys and had discussions with them, they made it clear that they were not going to put any more money into the Foxfield Project, in part, because they looked at the appraisal which showed the Foxfield Project was upside down by $700,000.00 to $1 million in the value of the collateral in relationship to the amount of the loan.

102.    According to Robben, Vielhauer and the Kenneys were willing to walk away from the $800,000.00 investment they already had made in the Foxfield Project because they were unwilling to put more money into the Foxfield Project based upon its past financial losses and the current values of the collateral.

103.    According to Robben, he and the Bank had discussions about his partners refusal to put any more money into the Foxfield Project based upon poor financial

performance and the new appraisal and that is when the Bank and Robben developed their new strategy to go find new investors.

104.    According to Robben, the Bank understood that Robben approached Straub and Bartlett about coming up with new money to put into the Foxfield Project after the Bank was well aware that the existing partners refused to invest any more money in the Foxfield Project based upon financial losses and the appraisal conducted in the fall of 2007.

***Once the Bank concluded that the existing investors in the Foxfield Project were willing to walk away from their $800,000 investment and liquidate the company, the Bank advised Robben to seek new investors.***

105.    In 2007, Robben went to the existing investors for the Foxfield Project and told them they were behind on the interest and that capital was needed to make the interest payments.

106.    Robben reported back to the Bank that both the Kenneys and Vielhauer were unwilling to put any cash into the deal and that they were willing to walk away from the $800,000.00 investment they had already made in the Foxfield Project.

107.    According to Robben, he had discussions with the Bank that more liquidity was needed in order to make the Foxfield Project move forward and the Bank understood that Robben had no liquid assets or resources upon which to draw because he had provided financial statements to the Bank and the Bank knew that he was suffering substantial losses in Calendar Year 2007 from real estate ventures he was already involved in.

108.     Robben's 2007 Tax Returns show that he lost over $700,000.00 in Calendar Year 2007.

109.     Moreover, Robben never volunteered to the Bank that he would liquidate exempt assets such as his 401-K to shore up the Foxfield Project, and the Bank never requested that he do so.

110.     Robben never told Bartlett and Straub that Vielhauer and the Kenneys refused to put any more money into the deal, and that they were both willing to walk away from the $800,000.00 that they had already invested in the Foxfield Project.

111.     No one from the Bank ever told Straub or Bartlett that Vielhauer and the Kenneys were willing to walk away from their $800,000.00 investment in the Foxfield Project even though the Bank was well aware of the fact.

112.     No one from the Bank ever communicated with Straub or Bartlett indicating that they understood that the Foxfield Project had always lost money and had always been late on their interest payments.

113.     When Robben and the Bank discussed the Foxfield Project in the fall of 2007 and Robben showed the appraisal that the Bank had conducted to Vielhauer and the Kenneys, Vielhauer and the Kenneys told Robben to advise the Bank that the assets of Foxfield Associates should be liquidated to pay as much of the loan as possible from the limited proceeds of sale.

114.    According to Robben, the Bank had no interest in having Foxfield Associates liquidate the assets and the Bank believed that the solution was that the Bank and Robben should find new investors.

115.    According to Robben, after the Bank made it clear they weren't interested in liquidation of the collateral, he and the Bank began to develop a strategy to come up with new investors to invest additional capital into the Foxfield Project.

**Paul Robben did not approach existing investors in other projects such as Jim Hatfield.**

116.    During the time period that Robben was looking for new investors for the Foxfield Project, he did not consult with Jim Hatfield who had been a partner with him on a number of projects prior to March of 2008.

117.    Jim Hatfield was partners with Robben on such projects as the Camden Woods Center and Mission Farms.

118.    Upon information and belief, the Mission Farms Project lost millions of dollars and Mr. Hatfield had no interest in pursuing any other ventures with Paul Robben as a result, in part, of those substantial losses.

**The Bank and Robben came up with a plan to get the Bank repaid in full on its loans that Robben guaranteed and dramatically reduce Robben's personal exposure on his guarantees by inducing new investors to purchase the Foxfield Project which both Robben and the Bank knew was not financially feasible; the Bank, Regnier, and Robben knew the amount owed to the Bank was approximately $850,000 more than the assets of the Foxfield Project had been appraised for by a licensed appraiser.**

119.    According to Robben, when he had communications with Ed Herman and other officers of the Bank concerning the Bank's position on the restructure of the Foxfield Project, Robben understood that Herman and the other officers were

communicating information they had received from the Bank's management including Regnier.

120.     According to Robben, even though the loans were in default and interest payments were not being made, he never received any demand from the Bank concerning repayment of the loan under the existing guaranties that he had with the Bank.

121.     The Bank's willingness to turn a blind eye to the defaults and forget pursuing claims against Robben on his guaranty all occurred during the time period that the Bank was strategizing with Robben about how to come up with new investors.

122.     Robben knew that banks would generally never renew a loan that was in default for failure to pay interest, and yet the Bank of Blue Valley was proposing just such a renewal once Robben and the Bank found new investors.

123.     According to Robben, once Vielhauer and the Kenneys refused to fund any more money into Foxfield Project, neither he nor the Bank considered the formation of a new LLC where Paul Robben was a 100% owner of the LLC and the Bank would finance the Foxfield Project on behalf of Robben individually.

124.     According to Robben, both the Bank and Robben clearly understood that if Robben was successful in finding new investors that his pro-rata share of the guaranteed amount would go down substantially.

125.     According to Robben, the Bank and Robben both agreed that the solution to the problems with the Foxfield Project was to find new investors to go forward to

bring liquidity and guarantor strength that Robben did not have and could not provide without the cooperation of the existing investors; unfortunately for the Bank and Robben, Vielhauer and the Kenneys made it clear they had no further interest in the failed Foxfield Project.

126.    Robben also indicated that one of the options was to sell the Foxfield Project, but both Robben and the Bank viewed this as unlikely to yield enough money to pay off the Bank in view of the recent appraisal the Bank had received.

127.    Obviously, the Bank as set out herein, did not wish to sell the Foxfield Project because it would have resulted in substantial losses to the Bank.

128.    None of this information was provided to Bartlett or Straub and according to Robben, he never heard anyone from the Bank advise Bartlett or Straub that the loan was classified as a rating of 8 substandard.

129.    Moreover, Robben never heard Bob Regnier in any meetings tell Rich Bartlett or Ernie Straub that the loan was in default, that the Robben Guaranty was of no value because of all the financial losses sustained by Robben, or that the Bank was placing no value on the Robben Guaranty because of Robben's financial losses.

130.    Accordingly, as part of the plan that the Bank and Robben implemented in order to restructure the Foxfield Project, Robben and the Bank planned to move part of the loan balance that Bank of Blue Valley currently had entirely guaranteed by Robben to another lender once the new investors with their additional guarantor power were

identified—this part of the strategy included moving $1 million of the Bank of Blue Valley loan to Bank Midwest.

131.    Moreover, as part of the Bank and Robben's strategy, Robben no longer wanted to take 100% risk on the loan transaction even if the loan could be moved to another lender.

132.    Part of the scheme devised by the Bank and Robben was for as much of the debt to be moved onto the portion of the Foxfield Project that would be guaranteed by Bartlett and Straub and leave a smaller amount of debt on the townhomes that Robben was going to be personally guarantying.

133.    At no time did Robben or Regnier ever discuss with Bartlett or Straub that after the loan transaction they were guarantying was loaded up with as much debt as possible, that Robben would be able to purchase the remaining townhomes at a much reduced price compared to their cost to build and the appraised value.

134.    Part of the Bank and Robben's strategy was to "Kick the can down the road", a phrase Robben heard Bob Regnier use from time to time.

135.    In essence, "kicking the can down the road" meant that the Bank and Robben would find investors who could pump enough money into the Foxfield Project to pay the Bank interest until the economy recovered.

136.    Additionally, the Bank knew, based upon the strategy that the Bank and Robben had developed, that Robben had fiduciary duties to both Straub and Bartlett as

a member of the newly formed LLC including a fiduciary duty to disclose information that Robben knew about the Foxfield Project and its profitability.

137.    The Bank also understood that Robben was a Real Estate Broker and had fiduciary duties to both Bartlett and Straub to disclose information to them as it relates to the real estate transaction that they were entering into.

138.    During the time that the Bank and Robben were implementing their strategy to lure new investors into the Foxfield Project, the real estate industry began to experience stress, and loans that were in default were often discounted in order to have investors invest in those loan transactions.

139.    The Bank of Blue Valley engaged in many transactions where they were willing to discount loan transactions because the loan was in default; in the instant case, however, the Bank nor Robben ever disclosed to Straub or Bartlett that the loan transactions between Robben and the Bank were in default, and accordingly there was no opportunity to negotiate the discounts that would normally go along with loans that were in default.

140.    The Bank and Robben also approached Epic Landscape Productions and its principals Marty Siler and John Constant about the prospect of those two men guarantying loans at the Bank of Blue Valley.

141.    Robben identified them as potential investors to the Bank of Blue Valley and the Bank of Blue Valley was well aware that Robben was approaching those two

individuals as potential investors in some of his failed real estate projects that the Bank of Blue Valley had financed.

142.    As part of the Bank and Robben's plan to seek out additional investors, Robben provided the pro-forma information on the profitability of the Foxfield Project to the Bank of Blue Valley that he intended to submit to the potential investors including Bartlett and Straub.

143.    According to Robben, the Bank was well aware of the planned structure for the transaction and the pro-formas that he was providing to Bartlett and Straub.

144.    Although Robben had structured the transaction with Vielhauer and the Kenneys, where Robben guaranteed 100% of the debt and Vielhauer and the Kenneys put up the cash, in the instant case the Bank nor Robben were willing to make any such recommendation or proposal to Bartlett and Straub.

145.    A structure whereby Bartlett and Straub put up the cash and Robben guaranteed all of the debt was never discussed by the Bank of Blue Valley or Robben because the entire premise behind the Bank getting new investors was to add cash and a viable guaranty for what the Bank and Robben both knew were projects that were significantly under-collateralized.

146.    Moreover, during none of the meetings that Robben attended with the Bank, Straub or Bartlett, did the Bank ever described to Bartlett or Straub the Bank's internal financial analysis of Foxfield Associates which showed, according to the Bank's

*Foxfield Villa Associates, LLC, et al. v. Bank of Blue Valley, et al.*
Complaint

analysis, that Foxfield Associates lost money in 2004, lost money in 2005, and lost money in 2006.

147.   Additionally, no one from the Bank ever indicated to Bartlett or Straub that its own financial analysis showed that in 2006, Foxfield Associates lost $239,000.00.

148.   The Bank also never advised Straub or Bartlett that the Bank's own evaluation of the collateral supporting the Foxfield Project was worth roughly $800,000.00 less than the ultimate payoff the Bank received in March of 2008 of $3,951,000.00.

149.   The fact is that the Bank of Blue Valley's internal analysis showed that the Bank believed that all the collateral that was security for the Bank's loans to Foxfield Associates was worth only $3.15 million, and the amount the Bank received as a payoff in full of all of the loans was $3,951,420.

150.   Thus, according to the Bank's own internal analysis when this loan closed in March of 2008, given that the payoff was $3,951,420.00 to the Bank of Blue Valley and the value of the collateral was only $3.15 million, the Loan-to-Value was 126% instead of the 80% Loan-to-Value which the Bank desired.

151.   According to the Bank's own internal analysis and representations to Robben, the maximum amount the Bank was comfortable loaning against the collateral before the Bank conjured up the scheme to bring in Bartlett and Straub was $2,520,000.00 which was 80% of the value of the real estate as valued by the Bank of $3,150,000.00.

152.    Accordingly, the Bank's own internal analysis showed that the Bank's collateral shortfall was over $1.4 million, and yet the neither Bank nor Regnier made any mention of this to Bartlett or Straub.

153.    Thus, the Bank needed $1.4 million of additional collateral in order for the Bank to continue financing the Foxfield Project for Robben without any new investors.

154.    As part of the Bank and Robben's scheme, the actual payoff for the 9.1 acres purchased by the new LLC formed with Bartlett and Straub as members was $877,521.00 which was approximately $100,000.00 per acre.

155.    The Bank knew in the Fall of 2007 that the appraisal for the 9.1 acres was roughly $500,000.00, and thus the Bank understood that in order for the Bank to be repaid 100% of the amount of the loan it made to Robben and his former partners that the Bank was going to accept a payoff on the land that was almost double what the Bank knew the land was worth.

156.    The Bank did not disclose any of the above information to Bartlett and Straub.

157.    According to Robben, part of the plan that he and the Bank agreed to was that the Bank of Blue Valley would be paid 100 cents on the dollar for all the money it advanced, and all the interest that had not been paid by Robben and the former partners, Vielhauer and the Kenneys.

158.    Moreover, part of the strategy included that the old investors would walk away from their $800,000.00 investment and that Robben would try to use the new

investors and the strength of their personal financial statements to move part of the loan out of the Bank of Blue Valley and to Bank Midwest.

159.    None of this information on how the Bank and Robben were going to execute their shell game was ever disclosed to Bartlett or Straub.

160.    According to Robben, Bank of Blue Valley had communicated generally to him that they understood that the value of his Guaranty was very little and that the only reason the Bank was going to continue to finance the Foxfield Project was the strength of Straub and Bartlett's guaranties.

### *Initiation of the relationship by the Bank.*

161.    As set out herein, the Bank sought Bartlett and Straub dating back to at least the fall of 2007 as potential investors in Robben's failed real estate deals.

162.    During that time period, the Bank through a sequence of conduct, established a common basis of understanding and a course of dealing and course of performance in the manner to conduct business with the Foxfield Villa Parties.

163.    The Bank sought out the Foxfield Villa Parties to establish a banking relationship with the Bank and to establish certain projects, accounts and loans with the Bank.

164.    In order to effectuate the completion of the Foxfield Villa Parties' projects, there was a relationship of trust between the Foxfield Villa Parties, and the Bank as it relates to the nature of the financing of the projects.

165.    The Bank repeatedly promoted itself to the Foxfield Villa Parties as a trusted financial resource.

166.    The Foxfield Villa Parties highly regarded, and placed their trust in, and relied on the Bank as their trusted financial resource and the Bank knew that the Foxfield Villa Parties relied on them for this advice.

167.    The Bank also considered the Foxfield Villa Parties to be excellent customers with whom the Bank wanted to continue to expand their relationship.

168.    The Foxfield Villa Parties believed that when the Bank, its officers and directors made promises to the Foxfield Villa Parties that the Bank would meet these high standards for honesty and fairness in all of its dealings with the Foxfield Villa Parties, and that those promises would be fulfilled.

169.    The Foxfield Villa Parties also believed they could depend on the Bank's truthfulness, trustworthiness, and loyalty; that the Bank would be devoted and faithful to protecting the Foxfield Villa Parties' interests and would not be dishonest or disloyal to the Foxfield Villa Parties' business interests.

170.    The Bank also openly promoted its honesty and ease with which the Foxfield Villa Parties could deal with the Bank on a daily basis, including that the Bank would never make any false or misleading statements to the Foxfield Villa Parties.

171.    The Bank's Code of Conduct dated May 2007 expressly states that "[e]mployees, directors, agents of Blue Valley Ban Corp. and its subsidiaries should always conduct business in a manner consistent with the letter, spirit, and intent of all

federal, state and local laws and regulations as well as scrupulous regard for the highest standards of conduct and personal integrity."

172.    Moreover, the Bank's Code of Conduct provides that "[a]ll employees, directors, agents of Blue Valley Ban Corp. and its subsidiaries should refrain from illegal, dishonest or unethical conduct.   Common sense and good judgment based on high ethical principles should always govern business conduct."

**The land acquisition and restructure of Foxfield Villa in 2008.**

173.    In 2008 Bartlett and Straub were approached regarding a development project in Olathe, Kansas and the restructure of Foxfield Villa.

174.    The Bank, through its officers and directors, met with both Bartlett and Straub concerning the restructure of Foxfield Villa by Paul Robben.

175.    The Bank played an integral role in convincing both Bartlett and Straub to invest in the Foxfield Project.

176.    While convincing Straub and Bartlett to invest in the Foxfield Project, the Bank and Regnier made false representations to the Foxfield Villa Parties in violation of the Bank's Code of Conduct.

177.    The Bank and Regnier also violated the Bank's Code of Conduct by failing to disclose material facts regarding the financial condition and performance of the Foxfield Project and its developer Paul Robben.  For example, the Bank never indicated at any time during discussions or meetings prior to closing the transaction to Bartlett or

Straub that Robben's Guaranty in the amount of $360,000.00 was of little or no value based upon his current financial condition.

178.    Based in part on the Bank's representations to both Bartlett and Straub, and the withholding of material information that the Bank had concerning the Foxfield Project and Robben, both Bartlett and Straub became involved in Foxfield Villa.

179.    Both Bartlett and Straub have invested substantial sums in the Foxfield Project.  To date Bartlett and Straub estimate that they have invested approximately $1,200,000.00 in out of pocket expenditures on the Foxfield Project.  Bartlett and Straub also signed Guaranties purporting to guarantee payment of the indebtedness alleged to be owed to the Bank.

180.    The Foxfield Villa Parties also accepted a loan from Bank Midwest in the principal amount of $975,000 for the purpose of paying off a loan previously provided by Bank of Blue Valley to Foxfield Associates.  Bartlett and Straub provided personal guaranties as to repayment of this loan.  Straub and Bartlett further invested approximately $500,000 in connection with this loan by Bank Midwest for interest, fees, and other general costs of the project.

***The Bank's failure to act in good faith and deal fairly with the Foxfield Villa Parties.***

181.    The duty of good faith and fair dealing prohibits a party from intentionally and purposefully doing anything to prevent the other party from carrying out his or her part of the agreement, or from doing anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

182.    The Bank breached the duty of good faith in several respects throughout this transaction, including intentionally deceiving the Foxfield Villa Parties to sign documents.

183.    Moreover, good faith is "honesty in fact in the conduct or transaction concerned."   Good faith also includes "honesty in fact in the observance of reasonable commercial standards of fair dealing in the trade."   Finally, good faith means:

> "Good faith in performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party; it excludes a variety of types of conduct characterized as involving 'bad faith' because they violate community standards of decency, fairness, or reasonableness."

184.    The Bank and Regnier's actions against the Foxfield Villa Parties constitute a clear breach of its duty of good faith and fair dealing.

185.    The Bank and Regnier did not exhibit honesty in fact, did not observe "reasonable commercial standards" and did not act consistently "with the justified expectations of the other party."

186.    Bank and Regnier's actions specifically involved "bad faith," and included fraudulent misstatements.   The Bank and Regnier's actions violated community standards of decency, fairness, and reasonableness, as well as their own Code of Conduct.

187.    This is despite the fact that the officers and directors who were making decisions for the Bank had to fulfill the obligations the Bank had to the customer including the obligation to deal with the customer in good faith.

*Foxfield Villa Associates, LLC, et al. v. Bank of Blue Valley, et al.*
Complaint

188.    The officers and directors of the Bank knew that they must make sure that the Bank was proceeding consistent with their representations; the written documents that the Bank had with the Foxfield Villa Parties in order to be sure that the Bank actions were consistent with those representations and those written agreements.

189.    The Bank told the Foxfield Villa Parties that the Foxfield Villa Parties could rely on the Bank to conduct its business with the highest standards of honesty and fairness.

190.    The Bank's Code of Conduct dated May 2007 expressly states that "[e]mployees, directors, agents of Blue Valley Ban Corp. and its subsidiaries should always conduct business in a manner consistent with the letter, spirit, and intent of all federal, state and local laws and regulations as well as scrupulous regard for the highest standards of conduct and personal integrity."

191.    Moreover, the Bank's Code of conduct provides that "[a]ll employees, directors, agents of Ban Corp. and its subsidiaries should refrain from illegal, dishonest or unethical conduct.   Common sense and good judgment based on high ethical principles should always govern business conduct."

192.    The Bank and Regnier openly told the Foxfield Villa Parties that it believed it had a "trusted" relationship with the Foxfield Villa Parties and this was part of the Bank's policy.

193.    The Bank's high standards, as indicated in its Code of Conduct, included complying with the spirit of the law as well as the letter of the law.

194. The Bank and Regnier openly promoted its honesty and ease with which the Foxfield Villa Parties could deal with the Bank on a daily basis, including that the Bank would never make any false or misleading statements to the Foxfield Villa Parties.

195. The Bank's actions specifically involved "bad faith" and included fraudulent misstatements.

196. The Bank's actions violated community standards of decency, fairness, and reasonableness.

**Fiduciary duties of the Bank.**

197. "A fiduciary relation does not depend upon some technical relation created by, or defined in, law. It may exist under a variety of circumstances, and does exist in cases where there has been a special confidence reposed in one who, in equity and good conscience, is bound to act in good faith and with due regard to the interests of the one reposing the confidence."

198. Some of the indicia of a fiduciary relationship include: (1) the acting of one person for another; (2) the having and exercising of influence over one person by another; (3) the reposing of confidence by one person in another; (4) the dominance of one person by another; (5) the inequality of the parties; (6) and dependence of one person upon another.

199. A fiduciary relationship may arise in situations in which "the bank had dealt directly with the customer regarding the matters involved in the litigation, and the

bank had knowledge of the reliance and confidence of the customer, in some instances the bank stood to profit from non-disclosure to the customer."

200.    When the Bank exerted control over certain aspects of the Foxfield Villa Parties' business which results in the Bank's own benefit, then the Bank becomes a fiduciary.

201.    Moreover, "[w]here one party to a contract or transaction has superior knowledge, or knowledge which is not within the fair and reasonable reach of the other party and which he would not discover by the exercise of reasonable diligence, or means of knowledge which are not open to both parties alike, he is under a legal obligation [in essence, fiduciary] to speak, and his silence constitutes fraud."

202.    The Bank and Regnier had superior knowledge of the Bank's own financial condition and that of Robben, the regulatory scheme that they were under, and the Bank's own capital structure.  The Bank and Regnier never disclosed any of this information to the Foxfield Villa Parties and how it would impact the Bank's ability to perform and Robben's ability to perform, but enticed the Foxfield Villa Parties to sign documents.

203.    For example, the Bank was well aware of the fact that the office of the Comptroller of the Currency had published directives in January 2008 that banks with excessive concentrations in real estate loans would be directed by regulators to reduce those real estate concentrations.

204.    In 2008, the Bank had real estate loans totaling over $465,000,000 which was over 600 percent of the Bank's capital at the end of 2007 which was only $71,988,000.

205.    The fact is that the Bank had grown rapidly mostly by making real estate loans.

206.    Moreover, the Bank's "heavy real estate" concentration caused losses related to these bad loans.

207.    The Bank's profits in 2008 through 2011 shows losses of $38,357,000 during this four year time period – nearly $10.0 million per year.

208.    According to Regnier, the Bank was attempting to "reduce the Bank's exposure to real estate loans."

209.    As part of the Bank's and Regnier's overall strategy to reduce its exposure to real estate loans it undertook an aggressive strategy to recruit investors to financially support loans that the Bank knew it would sustain massive losses on in the event the Bank exercised its rights against the current developers and guarantors.

210.    As part of the Bank's and Regnier's overall strategy to recruit "new" investors to support the failing and poorly underwritten loans already on the Bank's books, the Bank and Regnier induced Mr. Bartlett and Mr. Straub to invest monies in real estate transactions that the Bank and Regnier had already determined were going to be substantial losses for the Bank.

211.    As part of the Bank and Regnier's strategy to entice these investors to support the Bank's stressed and underwater loan portfolio, the Bank and Regnier intentionally induced investors with false statements concerning the attractiveness of the real estate projects that the Bank already knew had been losers.

212.    As part of the fraud perpetrated on Bartlett and Straub, the Bank and Regnier failed to disclose that the Bank classified the Foxfield Villa loan with a risk rating of "8-Doubtful," meaning that collection or liquidation of the full amount of the loan was highly questionable and improbable.

213.    The Bank and Regnier further failed to disclose that it classified the Foxfield Villa loan as a "nonaccrual loan" and as "substandard."

214.    The Bank and Regnier additionally failed to disclose that the original loan to Woodstone, Inc. on the project was in default from its inception and late charges had been charged each month.

215.    The Bank and Regnier never disclosed that the Bank considered all of Mr. Robben's loan transactions with the Bank to be in a "workout" in late 2007 and early 2008 because they were in default.

216.    The Bank's and Regnier's "total workout strategy" with Robben in 2007 and 2008 involved Robben's guaranty of over $7,200,000 in loans with Bank of Blue Valley.  The proposed loan transaction was an "exception" to the Bank's loan policy, which the Bank justified in part because it was a "workout."

217.    The Bank and Regnier never disclosed that various subcontractors for the Foxfield Villa Project had not been paid for work completed prior to Straub and Bartlett signing the loan documents, and that loan proceeds were used to pay certain debts to subcontractors.

218.    As of December 31, 2007, retained earnings and net income for Foxfield Associates totaled a negative $707,412.75 and the net income for Foxfield Associates in 2008 totaled a negative 121,444.51.

219.    The Bank and Regnier possessed such financial information regarding the performance of Foxfield Associates prior to March 24, 2008, but failed to disclose its unsuccessful track record to the Foxfield Parties, but instead promoted Robben as a successful and profitable developer.

220.    At no time during any of the discussions or meetings prior to closing the transaction did the Bank or Regnier ever indicate to Bartlett or Straub that the Robben Guaranty was of little or no value, even though the Bank knew that Robben's personal guaranty was supported by only $12,500 in liquid cash.  The bank knew and failed to disclose that Robben provided "no guarantor strength."

221.    The Bank and Regnier knew and failed to disclose that other Robben projects featuring townhomes similar to those at Foxfield Villa had failed, and that the units would remain unsold.

222.    None of the Bank's and Regnier's actions can be reconciled with the standard of "faithfulness to an agreed common purpose" and "justified expectations" of the Foxfield Villa Parties.

223.    By failing to disclose material facts, the Bank's and Regnier's actions against the Foxfield Villa Parties violated the Bank's Code of Conduct.

224.    The Bank and Regnier's actions against the Foxfield Villa Parties, with whom it had had a mutually agreeable and profitable relationship, also constitute a breach of its duty of good faith and fair dealing; the Bank did not exhibit honesty in fact, did not observe "reasonable commercial standards" and did not act consistently "with the justified expectations of the other party."

225.    Moreover, Stewart M. Stein ("Stewart Stein"), attorney for the Bank, affirmatively represented to Mr. Straub in a meeting during the fall of 2011 that the loans at issue had "always been performing loans."

226.    Mr. Stein's representation to Mr. Straub concerning the loans at issue was false when he made it, and Mr. Stein knew that said statement was false.  This statement is indicative of a pattern of deceit and fraud by the Bank.

**Other tortious actions.**

227.    Bank of Blue Valley and Regnier tortiously interfered with the Foxfield Villa Parties contractual relations with its venders and others.

228.    The Bank and Regnier knew that Straub and Bartlett were entering into agreements with Robben based on the fraudulent scheme orchestrated by the Bank and

Robben and thus tortiously interfered with Bartlett and Straub's expectation of profiting from the investment of their liquid assets.

229.    Bank of Blue Valley and Regnier acted with requisite intent and with an improper motive.

***Malicious intent to harm the Foxfield Villa Parties.***

230.    The Bank, through its officers undertook intentional actions with the specific intent to injure the Foxfield Villa Parties.

231.    There was no justification for the Bank's actions.  They knew the serious harm that would result to the Foxfield Villa Parties, and acted with malice.

***The Bank and Regnier fraudulently induced the Foxfield Villa Parties to sign documents.***

232.    The Bank faced high regulatory scrutiny, and after receiving benefits under the Troubled Asset Relief Program ("TARP") the Bank was unable to meet the payment schedule initially requested to repay its obligations.

233.    Bank of Blue Valley has failed to make any payments on the approximately $21.75 million in TARP funds it received.  During the same general time period, the Bank was attempting to mitigate its losses experienced from nonperforming loans by recruiting new investors for such loans.

234.    In an effort to induce the Foxfield Villa Parties to invest in the Foxfield Project, the Bank and Regnier committed both fraudulent and negligent misrepresentation as set forth herein.

235.    The Bank and Regnier were clearly acting with an improper motive.

236.    Further, as set forth in more detail elsewhere, the Bank and Regnier engaged in numerous independently tortious and wrongful acts to accomplish their purposes.

237.    The Bank and Regnier also engaged in numerous misrepresentations and misstatements to the Foxfield Villa Parties, including, without limitation, the fraudulent statements made to induce the Foxfield Villa Parties to sign loan documents and other papers.

238.    The Bank, by and through its agents including Regnier, represented to the Foxfield Villa Parties that the Foxfield Project was successful in the past, and would continue to experience success.

239.    The Bank and Regnier represented that payments had been made under loans previously made by the Bank to fund the Foxfield Project.

240.    The Bank and Mr. Regnier also represented that Paul Robben was one of the most successful real estate developers in the Kansas City area.

241.    Mr. Regnier personally stated that Mr. Robben was "one of the most prolific multifamily builders in Kansas City."

242.    The Bank and Regnier not only intentionally interfered with the Foxfield Villa Parties business expectancy, but did so for a wrongful and improper motive, and utilized independently wrongful and fraudulent means.

243.    The Bank and Regnier encouraged the Foxfield Villa Parties to repose special trust and confidence in its advice; the Bank and Regnier took actions which

directly benefited the Bank and Regnier and harmed the Foxfield Villa Parties despite the trust placed in the Bank and Regnier.

***The Bank fraudulently induced the Foxfield Villa Parties to sign loan documents with Bank Midwest.***

244.    Bank of Blue Valley was motivated to withhold information and to engage in numerous misrepresentations and misstatements to ensure its receipt of a loan payoff from Bank Midwest.

245.    On March 24, 2008, Bank Midwest provided Foxfield Villa with a loan evidenced by a $975,000 promissory note dated March 24, 2008 ("Bank Midwest Note").

246.    A portion of the proceeds of this loan by Bank Midwest were transferred to Bank of Blue Valley in order to pay down a debt owed by Foxfield Associates and Paul Robben as a Guarantor to Bank of Blue Valley.

247.    This debt owed to Bank of Blue Valley was originally incurred by Foxfield Associates and its members in connection with the purchase and development of 6.07 acres of land containing 38 townhome lots located at 119th & Lone Elm in Olathe, Kansas described as follows:

> Tract D, the Townhomes at Foxfield Village, Sixth Plat, a subdivision in the City of Olathe, Johnson County, Kansas
>
> AND
>
> Lots 121 through 140 inclusive, the Townhomes at Foxfield Village, Third Plat, a subdivision in the City of Olathe, Johnson County, Kansas ("Townhomes at Foxfield Village").

248.    To secure payment of the Bank Midwest Note, Foxfield Villa provided a Mortgage to Bank Midwest in the amount of $975,000 dated March 24, 2008 ("Bank

Midwest Mortgage"). Bank Midwest recorded the Bank Midwest Mortgage on April 1, 2008 in Johnson County, Kansas as document number 20080401-0000381 in Book 200804 at Page 000381.

249. Foxfield Villa also provided Bank Midwest with an Assignment of Rents dated March 24, 2008, and recorded on April 1, 2008, in Johnson County, Kansas as document number 20080401-0000382 in Book 200804 at Page 000382.

250. To further secure payment of the Bank Midwest Note, Ernest Straub signed a Commercial Guaranty in connection with this loan on March 24, 2008 (the "Straub Bank Midwest Guaranty").

251. Under the terms of the Straub Bank Midwest Guaranty, Straub "absolutely and unconditionally guarantees full and punctual payment and satisfaction of the Indebtedness of Borrower to Lender, and the performance and discharge of all Borrower's obligations under the Note and Related Documents."

252. To further secure payment of the Bank Midwest Note, Richard Bartlett also signed a commercial guaranty in connection with this loan on March 24, 2008 (the "Bartlett Bank Midwest Guaranty").

253. Under the terms of the Bartlett Bank Midwest Guaranty, Bartlett "absolutely and unconditionally guarantees full and punctual payment and satisfaction of the Indebtedness of Borrower to Lender, and the performance and discharge of all Borrower's obligations under the Note and Related Documents."

254.    Bank of Blue Valley knew that Mr. Straub and Mr. Bartlett would provide personal guaranties in connection with this loan from Bank Midwest.

255.    Bank of Blue Valley knew that Bank Midwest would not provide Foxfield Villa with a $975,000 loan absent the signing of the Straub and Bartlett Bank Midwest Guaranties.

256.    Bank of Blue Valley therefore knew that it would not receive the payoff from the proceeds of the Bank Midwest loan absent the signing of the Straub and Bartlett Bank Midwest Guaranties.

257.    If the Bank of Blue Valley would have disclosed to Straub and Bartlett the information withheld as described herein, it risked Straub and Bartlett refusing to sign the Straub and Bartlett Bank Midwest Guaranties.

258.    By withholding information and engaging in misrepresentations and misstatements, Bank of Blue Valley induced Straub to sign the Straub Bank Midwest Guaranty, and Bartlett to sign the Bartlett Bank Midwest Guaranty.

259.    The Bank Midwest Note was renewed and modified by Change in Terms Agreements dated March 19, 2009, May 19, 2009, September 19, 2009, November 19, 2009, and February 1, 2010.

260.    The Bank Midwest Note was refinanced by Country Club Bank on July 30, 2010.

261.     Foxfield Villa provided Country Club Bank with Promissory Note No. 22112619 in the principal amount of $975,000 dated July 30, 2010, with a maturity date of July 30, 2012 (the "Country Club Note").

262.     To secure payment of the Country Club Note, Foxfield Villa provided Country Club Bank with a Mortgage dated July 30, 2010 (the "Country Club Mortgage") covering the Townhomes at Foxfield Village.

263.     Also to secure payment of the Country Club Note, Ernest Straub provided Country Club Bank with a personal Guaranty dated July 30, 2010 (the "Straub Country Club Guaranty").

264.     Richard Bartlett also provided Country Club Bank with a personal Guaranty dated July 30, 2010 (the "Bartlett Country Club Guaranty").

265.     The Straub and Bartlett Country Club Guaranties state that the respective Guarantors "absolutely and unconditionally agree to all terms of and guaranty to you the payment and performance of each and every Debt, of every type, purpose and description that the Borrower either individually, among all or a portion of themselves, or with others, may now or at any time in the future owe you, including by not limited to…a promissory note or other agreement, No. 22112619, dated July 30, 2010, from Foxfield Villa Associates, LLC (Borrower) to you, in the amount of $975,000."

266.     By withholding information and engaging in misrepresentations and misstatements, Bank of Blue Valley also caused Straub and Bartlett to further invest

approximately $500,000 in connection with these loans by Bank Midwest and Country Club Bank for interest, fees, and other general costs of the project.

267.    Bank of Blue Valley and Regnier encouraged the Foxfield Villa Parties to repose special trust and confidence in its advice.

268.    Bank of Blue Valley and Regnier took actions which directly benefited Bank of Blue Valley and harmed the Foxfield Villa Parties despite the trust placed in Bank of Blue Valley.

## COUNT I
### (Fraudulent Nondisclosure against Regnier)

269.    The Foxfield Villa Parties incorporate the allegations contained in paragraphs 1 through 268 as if fully set forth herein.

270.    Throughout the process of inducing of Straub and Bartlett as investors for the Foxfield Project, a relationship existed of trust and confidence between the Foxfield Villa Parties, the Bank, and Regnier on the subject of the Foxfield Villa Parties' ownership of the project which gave rise to a duty of disclosure by the Bank and Regnier.

271.    While such relationship existed, the Bank and Regnier failed to disclose material information to the Foxfield Villa Parties including that information set out elsewhere herein.

272.    As set forth elsewhere herein, the Bank and Regnier communicated to the Foxfield Villa Parties that the Foxfield Project and Robben were both viable, and had previously experienced financial success.

273. The Bank and Regnier also represented that Paul Robben was one of the most successful real estate developers in the Kansas City area.

274. Regnier personally stated that Mr. Robben was "one of the most prolific multifamily builders in Kansas City."

275. As set forth elsewhere herein, the Bank and Regnier knew, however, that its representations concerning the prior performance of the Foxfield Project and Paul Robben were false.

276. The Bank and Regnier knew, among other facts, that its loans to Foxfield Associates were in default, and that Foxfield Associates had generated a negative $707,412.75 in retained earnings by December 31, 2007.

277. The Bank and Regnier failed to disclose material information, as more fully set out herein, in an effort to induce the Foxfield Villa Parties to sign the alleged Guaranties.

278. Such failure to disclose material information violated the Bank's Code of Conduct.

279. All of these undisclosed matters were material to the Foxfield Villa Parties.

280. The Bank and Regnier, for the purpose of inducing the Foxfield Villa Parties to obtain financing from the Bank and intending that the Foxfield Villa Parties rely upon information from the Bank and Regnier, the Bank's and Regnier's failure to disclose adverse facts regarding the Foxfield Project and Robben, were fraudulent.

281.   The Bank and Regnier failed to disclose material information also to induce the Foxfield Villa Parties to obtain $975,000 in financing from Bank Midwest to pay off a loan by Bank of Blue Valley, and to induce the Foxfield Villa Parties to sign loan documents in connection with this Bank Midwest loan.

282.   This failure to disclose material information also caused Straub and Bartlett to invest approximately $500,000 in connection with such financing from Bank Midwest (and later Country Club Bank) for interest, fees, and other general costs of the project.

283.   The Bank knowingly failed to make the disclosures.

284.   The Bank and Regnier intended to deceive the Foxfield Villa Parties by withholding the information.

285.   The Foxfield Villa Parties acted in reliance on the Bank's and Regnier's failure to disclose, and the Foxfield Villa Parties were justified in such reliance.

286.   As a direct and proximate result of the Bank's and Regnier's failure to disclose material information, the Foxfield Villa Parties have incurred damages.

287.   The Bank and Regnier's actions were malicious, and with wanton, reckless disregard to the rights of Straub and Bartlett.

WHEREFORE, the Foxfield Villa Parties request that this Court enter judgment in favor of the Foxfield Villa Parties and against the Bank and Robert D. Regnier jointly and severally in the amount of their damages as established by the evidence, which are in excess of $75,000.00; for pre-judgment interest and post-judgment interest as

provided by law; for punitive damages as provided by law; for their costs and expenses incurred herein; and for any and all other relief that this Court deems just and proper.

## COUNT II
### (Fraud against the Bank and Regnier)

288.    The Foxfield Villa Parties restate and incorporate the allegations in paragraphs 1 through 287 as though fully set forth herein.

289.    The Bank, by and through its agents including Regnier, made material misrepresentations to the Foxfield Parties.

290.    These misrepresentations include, but are not limited to, representations that the Foxfield Project had been successful in the past, and would continue to experience success.

291.    The Bank and Regnier also represented that Paul Robben was one of the most successful real estate developers in the Kansas City area; Mr. Regnier personally stated that Mr. Robben was "one of the most prolific multifamily builders in Kansas City."

292.    Bank of Blue Valley and Regnier also failed to disclose material information to the Foxfield Villa Parties including, without limitation, that information set out herein.

293.    Such false representations and failure to disclose material information violated the Bank's Code of Conduct.

294.    All of these representations and undisclosed matters were material to the Foxfield Villa Parties.

295.     The Bank of Blue Valley and Regnier, for the purpose of inducing the Foxfield Villa Parties and others to take actions detrimental to their interests, and intending that the Foxfield Villa Parties and others would rely upon both the statements made by the Bank and Regnier as well as the Bank's and Regnier's failure to disclose facts regarding Bank of Blue Valley's real intentions, have damaged the Foxfield Villa Parties.

296.     The Bank and Regnier falsely represented and failed to disclose material information to induce the Foxfield Villa Parties to obtain financing from Bank Midwest to pay off a loan by Bank of Blue Valley, and to induce the Foxfield Villa Parties to sign loan documents in connection with this Bank Midwest loan.

297.     The representations and failure to disclose material facts by Bank of Blue Valley and Regnier were false.   Bank of Blue Valley and Regnier knew the representations were false, or were without knowledge as to their truth or falsity when in fact they were false.

298.     The Foxfield Villa Parties relied on Bank of Blue Valley's and Regnier's representations in entering into agreements with Bank of Blue Valley.

299.     The Foxfield Villa Parties also relied on Bank of Blue Valley's and Regnier's representations when entering into agreements with Bank Midwest.

300.     Bank of Blue Valley and Regnier intended to deceive the Foxfield Villa Parties.

301.    The Foxfield Villa Parties acted in reliance on the truth of the representations and were justified in relying on the representations.

302.    As a direct and proximate result of Bank of Blue Valley's and Regnier's false representations and failure to disclose material information, the Foxfield Villa Parties have incurred damages.

303.    The Bank and Regnier's actions were malicious, and with wanton, reckless disregard to the rights of Straub and Bartlett.

WHEREFORE, the Foxfield Villa Parties respectfully request that the Court enter judgment in favor of the Plaintiffs and against  Bank of Blue Valley and Robert D. Regnier jointly and severally for such damages as are fair and reasonable in excess of $75,000, the exact amount to be proved at trial; for punitive damages as provided by law; for prejudgment and post-judgment interest as provided by law; for Plaintiffs' costs and expenses incurred herein; and for any and all other relief that this Court deems just and proper.

## COUNT III
### (Breach of Fiduciary Duty against the Bank and Regnier)

304.    The Foxfield Villa Parties incorporate the allegations of paragraphs 1 through 303 as if fully set forth herein.

305.    Throughout the relationship between the Foxfield Villa Parties, the Bank, and Regnier, a fiduciary relationship existed between the Foxfield Villa Parties, the Bank, and Regnier of trust and confidence on the subject of the Foxfield Villa Parties' completion of projects.

306.    The Bank and Regnier were under a duty to act for the benefit of the Foxfield Villa Parties in that the Bank and Regnier were required not to take actions which directly benefited the Bank and harmed the Foxfield Villa Parties including without limitation those actions set out herein.

307.    Confidence was placed by the Foxfield Villa Parties in the Bank and Regnier, and the Bank and Regnier exercised domination and influence over the Foxfield Villa Parties and their business.

308.    The confidence the Foxfield Villa Parties placed in the Bank and Regnier was used by the Bank and Regnier in an effort to dominate the Foxfield Villa Parties' business to induce the Foxfield Villa Parties to invest in the projects and to get the Foxfield Villa Parties to sign the loan documents with Bank of Blue Valley.

309.    The confidence the Foxfield Villa Parties placed in the Bank and Regnier was also used by Bank of Blue Valley in an effort to induce the Foxfield Villa Parties to sign loan documents with Bank Midwest.

310.    By these actions and inactions, the Bank and Regnier breached their fiduciary duties to the Foxfield Villa Parties and as a result of the Bank's and Regnier's reckless, wanton and malicious conduct, the Foxfield Villa Parties request damages.

311.    The breach of these fiduciary duties is the proximate cause of damage to the Foxfield Villa Parties.

WHEREFORE, the Foxfield Villa Parties request that this Court enter judgment in favor of the Foxfield Villa Parties and against the Bank and Robert D. Regnier jointly

and severally in an amount that is fair and reasonable in excess of $75,000; for pre-judgment interest and post-judgment interest as provided by law; for punitive damages as provided by law; for the Foxfield Villa Parties' costs and expenses incurred herein; and for any and all other relief that this Court deems just and proper.

### COUNT IV

(Tortious Interference with Contracts and Business Expectancy against the Bank and Regnier)

312.   The Foxfield Villa Parties incorporate the allegations of paragraphs 1 through 311 as if fully set forth.

313.   Contracts and business relationships existed between the Foxfield Villa Parties and a number of third parties including, without limitation the operating agreement entered into with Robben, and as a result, the Foxfield Villa Parties had an expectancy of profiting from the transactions.   A loss of the expected benefits has occurred and profits and returns from the capital invested by Straub and Bartlett has not been obtained as a result of the Bank's and Regnier's actions.

314.   The Bank and Regnier had knowledge of the Foxfield Villa Parties' contracts, business relationships, and expectancy of profiting from their investment.

315.   The Bank's and Regnier's actions were intentional, improperly interfered with the Foxfield Villa Parties' business relationships, contracts, and expectancy of profiting from their investments and were without justification or excuse and as a result of the Bank's and Regnier's reckless, wanton and malicious conduct, the Foxfield Villa Parties request damages.

316.    The Foxfield Villa Parties have been damaged by the Bank's and Regnier's actions.

WHEREFORE, the Foxfield Villa Parties request that this Court enter judgment in favor of the Foxfield Villa Parties and against the Bank and Robert D. Regnier jointly and severally for such damages as are fair and reasonable in excess of $75,000, the exact amount to be proved at trial; for prejudgment and post-judgment interest as provided by law; for punitive damages as provided by law; for the Foxfield Villa Parties' costs and expenses incurred herein; and for any and all other relief that this Court deems just and proper.

## COUNT V
(Negligent and/or reckless failure to supervise against the Bank, Regnier, the Bank Board of Directors, Blue Valley Ban Corp., and the Blue Valley Ban Corp. Board of Directors)

317.    The Foxfield Villa Parties incorporate the allegations of paragraphs 1 through 316 as if fully set forth herein.

318.    The Board of Directors of Bank of Blue Valley in 2007, 2008, 2009, and 2010 included Regnier, Alexander, Bodker, Dotson, Hunter, and Bond (collectively hereinafter referred to as the "Bank Board of Directors").

319.    The Board of Directors of Blue Valley Ban Corp. in 2007, 2008, 2009, and/or 2010 included Regnier, Alexander, St. Peter, Taylor, Brown, and McDonnell (collectively hereinafter referred to as the "Blue Valley Ban Corp. Board of Directors").

320.    The Bank, the Bank's Officers (including Regnier), the Bank Board of Directors, Blue Valley Ban Corp., Blue Valley Ban Corp.'s Officers (including Regnier), and the Blue Valley Ban Corp. Board of Directors (hereafter referred to as the "Supervisors") had a duty to supervise employees and officers of the Bank in the course of their activities on behalf of the Bank, and in connection with the Bank's communications and transactions with the Foxfield Villa Parties in 2007, 2008, 2009, and 2010.

321.    The Supervisors breached their duty to supervise the Bank's employees in this regard by, among other things, failing to review the actions of Regnier and other bank employees in making false representations and failing to disclose material facts in violation of the Bank's Code of Conduct in connection with the loan transactions described herein.

322.    The Supervisors' failure to supervise was negligent with reckless and wanton indifference to the rights of the Foxfield Villa Parties, and/or with malice.

323.    As a direct and proximate result of the Supervisors' breach of their supervisory duty, the Foxfield Villa Parties have been damaged.

WHEREFORE, the Foxfield Villa Parties respectfully request that the Court enter judgment in favor of the Foxfield Villa Parties and against Bank of Blue Valley, Blue Valley Ban Corp., Robert D. Regnier, Donald H. Alexander, Harvey S. Bodker, Suzanne E. Dotson, Charles H. Hunter, Richard L. Bond, Anne D. St. Peter, Robert D. Taylor, Michael J. Brown, and Thomas A. McDonnell jointly and severally for such damages as

are fair and reasonable in excess of $75,000, the exact amount to be proved at trial; for prejudgment and post-judgment interest as provided by law; for punitive damages as provided by law; for the Foxfield Villa Parties' costs and expenses incurred herein; and for any and all other relief that this Court deems just and proper.

## COUNT VI
### (Civil Conspiracy)

324.    The Foxfield Villa Parties incorporate the allegations of paragraphs 1 through 323 as if fully set forth herein.

325.    The Bank along with Blue Valley Ban Corp., Regnier, the Bank Board of Directors, the Blue Valley Ban Corp. Board of Directors, and others (the "Conspiring Parties") conspired with an object to be accomplished to among other things commit fraud, fraudulent nondisclosure, negligent and malicious breach of contract with the Foxfield Villa Parties, tortious interference with the Foxfield Villa Parties' contracts and business expectancy, and breach of fiduciary duties owed to the Foxfield Villa Parties.

326.    The Conspiring Parties had a meeting of the minds on the course of action to among other things commit fraud, fraudulent nondisclosure, negligent and malicious breach of contract, tortious interference with the Foxfield Villa Parties' contracts and business expectancy and breach of fiduciary duties owed to the Foxfield Villa Parties for the purpose of improving the Bank's financial position.

327.    As a result of the actions of the Conspiring Parties set out herein, the Foxfield Villa Parties have been damaged.

WHEREFORE, the Foxfield Villa Parties respectfully request that this Court enter judgment in favor of the Foxfield Villa Parties and against the Conspiring Parties for damages in excess of $75,000 as established by the evidence, the exact amount to be proven at trial; for pre-judgment interest and post-judgment interest as provided by law; for punitive damages as provided by law; for their costs and expenses incurred herein; and for any and all other relief that this Court deems just and proper.

### COUNT VII
(Violations of Racketeer Influenced Corrupt Organizations Act)

328.    The Foxfield Villa Parties incorporate the allegations of paragraphs 1 through 327 as if fully set forth herein.

329.    The Bank, Regnier, Blue Valley Ban Corp., the Bank Board of Directors, and the Blue Valley Ban Corp. Board of Directors have intentionally deceived the Foxfield Villa Parties in order to improve their financial position.

330.    The Bank's and Regnier's fraudulent misrepresentations and non-representations to the Foxfield Villa Parties have been advanced or furthered by use of the United States mail for the purpose of executing the scheme or artifice.

331.    The Bank's and Regnier's fraudulent misrepresentations and non-representations to the Foxfield Villa Parties have been advanced or furthered by use of wires for the purpose of executing the scheme or artifice.

332.    The Bank and Regnier have made misrepresentations, non-representations, and engaged in bad faith conduct to defraud other persons in a similar position as the Foxfield Villa Parties using similar methods of commission and in

furtherance of similar purposes, namely to force the Bank's customers to move real estate loans out of the Bank and/or to shore up its real estate portfolio.

333.   Upon information and belief, such other persons include, but are not limited to, Bill Eddings, Roger Scott, and CWD Investments.

334.   Upon information and belief, the Bank's and Regnier's misrepresentations, non-representations, and/or conduct to these other similarly situated persons and/or entities included, without limitation, making false statements and failing to disclose material information to improve the Bank's position.

335.   The Bank has operated or managed an enterprise whose goal is to advance the Bank's schemes as to the Foxfield Villa Parties and others such as Bill Eddings, Roger Scott, and CWD Investments, and said enterprise includes owners and officers of the Bank including Regnier, Blue Valley Ban Corp., the Bank Board of Directors, and the Blue Valley Ban Corp. Board of Directors.

336.   The aforementioned enterprise has engaged in or affects interstate commerce.

337.   The Bank, Regnier, Blue Valley Ban Corp., the Bank Board of Directors, and the Blue Valley Ban Corp. Board of Directors have conducted and participated directly or indirectly in the conduct of the affairs of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C.A. §1962(c).

338.   The conduct of those involved in the enterprise threatens to be repeated or to extend into the future.

*Foxfield Villa Associates, LLC, et al. v. Bank of Blue Valley, et al.*
Complaint

339.    The acts of racketeering alleged herein have occurred within ten years of one another, constituting a pattern of racketeering activity.

340.    The Foxfield Villa Parties were injured in their business or property by reason of this violation of 18 U.S.C.A.  §1962(c) in that as a direct and proximate result of the complaint of acts, the Foxfield Villa Parties have been damaged.

341.    By reason of the violation of 18 U.S.C.A. § 1962(c), the Foxfield Villa Parties are entitled to threefold the damages sustained, plus interest and recovery of a reasonable attorneys' fee.

WHEREFORE, the Foxfield Villa Parties respectfully request that this Court enter judgment in favor of the Foxfield Villa Parties and against Bank of Blue Valley, Robert D. Regnier, Blue Valley Ban Corp., Donald H. Alexander, Harvey S. Bodker, Suzanne E. Dotson, Charles H. Hunter, Richard L. Bond, Anne D. St. Peter, Robert D. Taylor, Michael J. Brown, and Thomas A. McDonnell jointly and severally for threefold the damages sustained as established by the evidence, for pre-judgment interest and post-judgment interest as provided by law; for their costs and expenses incurred herein including attorney fees; and for any and all other relief that this Court deems just and proper.

## JURY DEMAND

The Foxfield Villa Parties demand a trial by jury as to all issues in the above-entitled matter so triable.

*Foxfield Villa Associates, LLC, et al. v. Bank of Blue Valley, et al.*
Complaint

## DESIGNATION OF PLACE OF TRIAL

The Foxfield Villa Parties hereby designate Kansas City, Kansas as the place of trial in this case.

Respectfully Submitted,

By: ___/s/ John M. Duggan___
      John M. Duggan, #14053
      Deron A. Anliker, #16877
      Thomas J. Hamilton, #24139
      David L. Ballew, #25056
      11040 Oakmont
      Overland Park, Kansas 66210
      jduggan@kc-dsdlaw.com
      danliker@kc-dsdlaw.com
      thamilton@kc-dsdlaw.com
      dballew@kc-dsdlaw.com
      Tele: (913) 498-3536
      Fax:  (913) 498-3538
      Attorneys for Plaintiffs