### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF KANSAS

**FOXFIELD VILLA ASSOCIATES, LLC, et al.,**

    **Plaintiffs,**

    **v.**                    **Case No. 12-2528/13-2120**

**PAUL ROBBEN and RDC HOLDINGS, LLC,**

    **Defendants.**

### MEMORANDUM & ORDER

This matter comes before the court upon defendants RDC Holdings, LLC ("RDC") and Paul Robben's Motion for Summary Judgment on Plaintiff's Sole Federal Claim and Motion to Dismiss for Lack of Subject Matter Jurisdiction (Doc. 183).

Also before the court are:

- Defendants' Motion Regarding Plaintiffs' Rebuttal Experts (Doc. 157)

- Defendants' Motion for Summary Judgment On Plaintiff's State Law Claims (Doc. 179)

- Defendants' Motion for Summary Judgment On Defendants' Affirmative Defenses (Doc 181)

- Plaintiffs Bartlett Family Real Estate Fund, LLC, Richard A. Bartlett, Foxfield Villa Associates, LLC, Pres, LLC, and Ernest J. Straub, III's Motion for Summary Judgment on Question of Whether PRES, LLC and Bartlett Family Real Estate Fund, LLC FVA Interests, and Bartlett's FVA Note are Securities (Doc. 185)

- Plaintiffs' Motion for Summary Judgment on Defendants' Mitigation of Damages and Statute of Limitations Affirmative Defenses (Doc. 187)

- Plaintiffs' Motion for Summary Judgment on Plaintiffs' Affirmative Claims (Doc. 189)

- Plaintiffs' Motion to Strike [201] Memorandum in Opposition to Motion, [202] Memorandum in Opposition to Motion, [199] Memorandum in Opposition to Motion, Exhibit A to Doc. 201, Exhibit B to Doc. 202, and Exhibit B to Doc. 199 (Doc. 208)

- Plaintiffs' Motion for Leave to file a Sur-reply in Opposition to Defendants' Motion for Summary Judgment on Plaintiffs' State Law Claims and Suggestions in Support (Doc. 215)

- Plaintiffs' Motion to Exclude and/or Strike Expert Evidence from Shawn D. Fox (Doc. 221) and

- Defendants' Motion to Exclude, Strike and/or Limit Testimony of Plaintiffs' Damages Expert (Doc. 223).

For the reasons explained more fully below, defendants' motion (Doc. 183) is granted and the court denies all other motions as moot.

## I.      Background

Plaintiffs filed this case on August 10, 2012 against various defendants, not including RDC and Robben (Doc. 1). The case was stayed January 17, 2013, pending the resolution of a related action that was pending in the District Court of Johnson County, Kansas (Doc. 34). In the meantime, on March 8, 2014, plaintiffs filed another federal suit involving the same factual basis as this case and nearly identical parties, adding defendants RDC and Robben. On August 9, 2013, the court consolidated the federal cases (Doc. 50). The stay was not lifted until November 25, 2015, when the court granted plaintiffs leave to file an amended complaint that added RDC and Robben to this case (Doc. 65). On May 25, 2016, the court entered a scheduling order, outlining agreed deadlines and procedures for discovery in this case (Doc. 94). It does not appear that the court ordered mediation in this case, in

part because it appeared fruitless to mediate when the parties did not have "something remotely approaching a common understanding of whether defendant RDC Holdings, LLC is judgment-proof." (Doc. 111.) "[T]he parties have no common understanding of the fairly simple key facts that should drive whether any judgment plaintiffs might obtain against Mr. Robben's company, co-defendant RDC Holdings, LLC, could be satisfied." (*Id.*)

On April 11, 2017, the court entered a pretrial order (Doc. 170). Plaintiffs objected to the order and sought review (Doc. 175). The undersigned denied plaintiffs' motion for review on January 12, 2018 (Doc. 230). The six motions for summary judgment currently before the court were filed on May 5, 2017. (Docs 179, 181, 183, 185, 187, 189.)

## II.     Legal Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The party moving for summary judgment has the burden to show "the lack of a genuine issue of material fact." *Ascend Media Prof'l Servs., LLC v. Eaton Hall Corp.*, 531 F. Supp. 2d 1288, 1295 (D. Kan. 2008) (citing *Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986))). Once the moving party meets this initial burden, the burden then shifts to the nonmovant to "set forth specific facts showing that there is a genuine issue for trial." *Id.* (citing *Spaulding*, 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986))).

The nonmovant may not rest on his pleadings or "rely on ignorance of the facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 259 (1986)); *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988).  Instead, the nonmovant is required to set forth specific facts, by referencing affidavits, deposition transcripts, or exhibits, from which a rational trier of fact could find for him.  Fed R. Civ. P. 56(c)(1); *see also Ascend Media*, 531 F. Supp. 2d at 1295 (citing *Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000)).  Summary judgment is not a "disfavored procedural shortcut" —it is an "integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." *Celotex Corp.*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

II.     Facts

A.  The Parties and Their Businesses

The following facts were either uncontroverted or viewed in the light most favorable to plaintiffs.  The remaining parties to this suit are: plaintiffs Foxfield Villa Associates, LLC ("FVA"); Richard A. Bartlett; Ernest J. Straub, III; Bartlett Family Real Estate Fund, LLC ("BFREF"); Pres, LLC ("Pres"); and defendants Paul Robben and RDC Holdings, LLC ("RDC").

Defendant Robben is an experienced single-family and multi-family developer and formed RDC.  Defendant Robben was involved with a prior company called Foxfield Associates, LLC, that was formed in 2000.  Robben owned Woodstone, Inc., a Kansas corporation that was a 10 percent owner of Foxfield Associates, LLC.  The other 90 percent was owned by parties not involved in this litigation.  Foxfield Associates, LLC owned the 9.16 acre tract that FVA eventually purchased.  It also had millions of dollars of debt liability to Bank of Blue Valley that defendant Robben personally guaranteed.

Defendant RDC has been out of business since 2013, but it had a single member, Development Services Corporation, which was owned by defendant Robben, who was the sole officer, director, and shareholder. RDC's charter was forfeited in 2014 for failing to file an annual report.

Plaintiff Bartlett has started, owned, served as CEO or chairman for, and sold various technology companies earning millions. Plaintiff Bartlett was also involved in several other real estate development projects with defendant Robben in the 2000s, including the Olathe Condo project, the Maple Crest project, and the Foxfield Villa project. Plaintiff BFREF is owned by plaintiff Bartlett and his wife Dena Bartlett, who are the only members.

Plaintiff Straub owns Straub Construction Company, Inc., which was incorporated in Kansas in 1988. He also owns Straub Homes, LLC, which primarily specializes in residential construction. Straub has owned and constructed other real estate development projects over the years, including Town & Country Villas in Shawnee, Kansas, in which he and his father each had a 50 percent interest; and Chapel Ridge Multifamily, LLC, in which Straub had a 50 percent interest.

In 2006, plaintiff Straub and defendant RDC formed Pres to acquire and develop the Mission Cliffs townhome subdivision in Kansas City, Kansas. Straub's company, Straub Construction, was the contractor on the Mission Cliffs project. RDC was manager of Pres until it resigned on January 1, 2009 because it could not meet required financial contributions. It relinquished its ownership interest in Pres on December 31, 2012. Straub is currently the only member of Pres.

FVA was organized in 2007, and the operating agreement was signed by Robben and Straub on behalf of Pres, and Bartlett on behalf of BFREF. Its members are still Pres and BFREF, but defendant Robben owns no interest.

**B.  The Foxfield Villa Project and Operating Agreement**

In October 2007 defendant Robben sent plaintiffs Bartlett and Straub a copy of a proposed operating agreement for FVA. In 2008, plaintiffs Bartlett and Straub signed the agreement, which granted BFREF and Pres each a 50 percent ownership interest in FVA. At the time, defendant RDC had a 50 percent ownership in Pres, which granted RDC a 25 percent interest in FVA. BFREF and Pres each made a $200,000 capital contribution prior to closing in March 2008. Pres's contribution consisted of $100,000 contributions from plaintiff Straub and defendant RDC.

The language in the operating agreement provides that action may be taken by a majority in interest, meaning any member or combination of members holding more than 50 percent interest in the company, unless otherwise specified. Some specific actions, such as modifying the business purpose by engaging the company in other business, requires unanimous written consent of all members or a supermajority. The agreement allowed any member with at least a 10 percent interest to request a special meeting at any time and for any member with a majority in interest to request periodic meetings.

Officers were to be elected by a majority in interest, and include a president and secretary. The members were allowed to elect a treasurer, vice presidents, treasurer(s), and secretaries in their discretion. Initially, the officers were defendant Robben serving as president and treasurer; plaintiff Straub serving as vice president; and plaintiff Bartlett serving as secretary. A majority determined salaries, if any, of officers. The president was the CEO and COO of the company and had general management of the day-to-day operations of the company. He was to "cause all decisions of the Members to be carried into effect." (Doc. 198-3, at 18.) The vice president acted in the president's absence. The secretary recorded proceedings of meetings. And the treasurer was to keep accounts and prepare financial statements. Defendant Robben was removed as president and treasurer of FVA in early 2009.

Additionally, each member could designate the names of two officers, directors, partners, members, managers, employees, or other affiliates to serve as the designated representatives of the member at meetings.  Each member was an agent for FVA and each was vested with management of the company.

The agreement required a majority in interest to make business decisions as set out by the agreement.  The list included, but did not limit, actions requiring a majority to: contracting with FVA's legal, accounting and professional advisors; purchasing property; borrowing from banks; decisions on suppliers and contractors; establishing prices and selling lots; forming and operating home associations; insuring the company and properties; investing funds; and approving documents.

The agreement required a supermajority, or 65 percent of the voting interest, to take certain specified actions, including but not limited to: purchasing land; filing for bankruptcy; assuming obligations or guarantees of other entities; and making loans or advances or investments to other entities.

The agreement provided that "each Member shall devote so much of its time and attention as is reasonably necessary and advisable to manage the affairs of the Company to the best advantage of the Company."  (*Id.* at 17.)

The agreement provided that financial records would be maintained at the principal office of FVA and that every member had the right to inspect and copy records.

In March 2008, to help with what were intended to be short-term cash flow issues, plaintiff Bartlett made an uncollateralized, unsecured $400,000 loan to FVA for which he was to receive an 8 percent return.  $200,000 of the loan was repaid in September 2008.  Due to the financial crisis, the other $200,000 was not repaid.

    .  **III. Discussion**

### A. Plaintiff's Count 9

#### 1. The Securities Exchange Act of 1934

Whether defendants are entitled to summary judgment on Count 9 depends on whether the investments plaintiffs made in FVA are "securities" within the meaning of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a–qq. A plaintiff seeking the protections of federal securities law must show that a defendant's misconduct involved the purchase or sale of a "security" as defined by the Act and interpreted by the federal courts. "The fundamental purpose undergirding the Securities Exchange Acts is to eliminate serious abuses in a largely unregulated securities market." *Reves v. Ernst & Young*, 494 U.S. 56, 60 (1990). The United States Supreme Court explains that Congress intended to encompass

> the virtually limitless scope of human ingenuity, especially in the creation of countless and variable schemes devised by those who seek the use of the money of others on the promise of profits and determined that the best way to achieve its goal of protecting investors was to define the term security in sufficiently broad and general terms so as to include within that definition . . . . broad[ly] to encompass virtually any instrument that might be sold as an investment.

*Ernst*, 494 U.S. at 60–61. The court noted however, that Congress did not "intend to provide a broad federal remedy for all fraud," leaving the SEC and federal courts ultimate task of determining which financial transactions are covered by the statute. *Id.* at 61 (quoting *Marine Bank v. Weaver*, 455 U.S. 551, 556 (1982)).

Section 3(a)(10) defines "security" as

> any note, stock, treasury stock, security future, security-based swap, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, **investment contract**, voting-trust certificate, certificate of deposit for a security, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or in general, any instrument commonly known as a "security"; or any

certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing; but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited.

15 U.S.C. § 78c(a)(10) (emphasis added).

## 2.  Defining Securities Exchange Act "Investment Contracts"

Defendants argue that they are entitled to summary judgment on plaintiffs' Count 9 because the Tenth Circuit in *Avenue Management II, L.P. v. Schaden*, 843 F.3d 876 (10th Cir. 2016), determined that limited liability companies' investments, such as plaintiffs' in this case, are not securities as defined by the Securities Exchange Act of 1934.  Plaintiffs argue that their LLC investments are "investment contracts" and that the court should apply the Supreme Court's decision in *S.E.C. v. W. J. Howey Co.*, 328 U.S. 293 (1946).  The court finds both decisions applicable, but neither as determinative as the parties would argue, because the definition of "securities" for purposes of coverage by the Securities Exchange Act necessarily depends on the facts of each case and the investment at issue.

Count 9 is brought only against defendant Robben and only by plaintiffs BFREF and Pres based on their ownership interest in FVA and plaintiff Bartlett based on the $400,00 loan he made FVA in March 2008.  Defendant RDC and plaintiffs FVA and Straub are not parties to Count 9.  Count 9 states that defendant Robben violated sections 10(b) and 10(b)5 of the Securities Exchange Act of 1934.  Plaintiffs include general factual contentions, but they provide no further details specific to Count 9 in the pretrial order, except to note for the purposes of damages, defendant Robben acted maliciously with wanton reckless disregard to plaintiffs' rights, which should entitle plaintiffs to punitive damages and attorney fees.  (Doc. 170, at 40.)  The parties do not raise, so the court will not address whether this conclusory assertion is sufficient even to survive the motion to dismiss stage of a

case.  For example, plaintiffs do not support this allegation with factual allegations about how defendants allegedly violated the Securities Exchange Act.  Whether or not plaintiffs explained this allegation in more depth in a former pleading is irrelevant as the pretrial order superseded all previous pleadings.  Especially in a case with over twenty separate claims, plaintiffs should have specifically set out which facts supported their Count 9 for violations of the Securities Exchange Act.

An instrument is an "investment contract" for purposes of the Securities Exchange Act if it is "a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party . . ." *Howey*, 328 U.S. at 298–99.  The Tenth Circuit has considered whether investors' "expected profits from [their] investments were to come solely from the efforts of others." *Schaden*, 843 F.3d at 882 (quoting *Howey*, at 301).  This is because "[a]n investor who has the ability to control the profitability of his investment, either by his own efforts or by the majority vote in group ventures, is not dependent upon the managerial skills of others." *Id.* (quoting *Gordon v. Terry*, 684 F.2d 736, 741 (11th Cir. 1982)). The greater the control plaintiffs had over their investment, "the weaker the justification to characterize their investments as investment contracts" subject to the protections of the Securities Exchange Act. *Id.*  To determine the degree of investor control, courts apply an objective analysis, focusing on the level of control investors could exercise, not the control they chose to exercise in fact. *Id.* at 884. Courts consider investors' "contribution of time and effort to the success of the enterprise, their contractual powers, their access to information, the adequacy of financing, the level of speculation, and the nature of the business risks. *Id.*

In *Schaden*, the Tenth Circuit found that owners of an LLC sufficiently controlled the profitability of their investment that they did not constitute investment contracts under the Securities Exchange Act.  Specifically, the Tenth Circuit noted that

- although the LLC was manager-managed, the daily operations were controlled by the officers rather than the members, and the members expected the board and officers to operate the investment company, the investors retained control because they collectively owned 80 percent of the LLC;

- could freely amend the LLC agreement;

- could choose eight of nine managers and remove them without cause;

- could receive audited and unaudited financial statements, and inspect, examine, and copy the investment company's books;

- designate non-voting members to attend board meetings;

- and the investors were sophisticated, informed, and capable of making informed decisions.

*Id.* at 882–85.  The Tenth Circuit found that the interests involved in *Schaden* could only be considered investment contracts if the investment company's "managers and officers were irreplaceable or otherwise insulated from [the investors'] ultimate control."  *Id.* at 884.

In *Howey*, the United States Supreme Court found that the investments at issue were "investment contracts" as defined by the Securities Exchange Act.  Investors were offered

> an opportunity to contribute money and to share in the profits of a large citrus fruit enterprise managed and partly owned by respondents. [Investors resided] in distant localities and [lacked] the equipment and experience requisite to the cultivation, harvesting and marketing of the citrus products. Such persons have no desire to occupy the land or to develop it themselves; they are attracted solely by the prospects of a return on their investment. Indeed, individual development of the plots of land that [were] offered and sold would seldom be economically feasible due to their small size. Such tracts gain utility as citrus groves only when cultivated and developed as component parts of a larger area. A common enterprise managed by respondents or third parties with adequate personnel and equipment is therefore essential if the investors are to achieve their paramount aim of a return on their investments. Their respective shares in this enterprise [were] evidenced by land sales contracts and warranty deeds, which serve[d] as a convenient method of determining the investors' allocable shares of the profits.

328 U.S. at 299–300.

### 3.   Plaintiffs' Investments Were Not "Investment Contracts"

The only issue that was briefed and before the court on this motion is whether plaintiffs' investments constituted investment contracts.  The investments plaintiffs made in FVA were made between investors in a common scheme for which they expected to receive a financial benefit from profits generated by FVA.  The issue then, is whether, according to the *Howey* case and its progeny, profits were to be derived solely from the efforts of others.  The court finds that they were not. Plaintiffs were not mostly passive investors, especially considering that investor control is determined objectively, meaning plaintiffs are considered to have the level of control they could exercise—not necessarily what they in fact chose to exercise.

Plaintiffs collectively owned 75 percent of FVA.  Plaintiffs argue that this was in fact, only a 50 percent interest owned by BFREF, because the Pres interest was entirely controlled by defendant RDC and therefore, defendant Robben. RDC did manage Pres at the time FVA was formed and therefore controlled, according to plaintiffs, 100 percent of Pres's interest in FVA.  The court is not persuaded by this argument.   Both Robben and Straub signed the operating agreement, they contributed equal capital to the venture, and although Straub allowed RDC to manage Pres at the time, there is nothing in the record that suggests that Straub could not have changed management if he so desired or that he relinquished his right to equal representation in the FVA venture by using RDC as a manager.  The court finds that despite Straub's decision to put RDC in the role of manager at Pres, plaintiffs collectively had a majority interest in FVA, enough to control all majority in interest and supermajority decisions—nearly all decisions the operating agreement contemplated.  They exercised their power by removing Robben from his board roles at FVA.

The members had the ability to elect officers with their simple majority. Nothing in the operating agreement suggests that the parties intended defendant Robben to manage FVA to the exclusion of plaintiffs taking an active role. The agreement continually suggests that plaintiffs were member-managers, whether they chose to exercise that authority or not. Plaintiffs had the right to appoint two members each to attend meetings. Plaintiffs were business-savvy investors, experienced in real-estate ventures. They engaged in business dealings with defendants on prior occasions and had active roles in the management of those investments. All parties knew the risks inherent to real-estate development and management, even discussing other investments at their depositions. (Docs. 184-10; 184-11.) Nothing in the FVA agreement suggests that such involvement was not contemplated or at the very least objectively allowed under the operating agreement. As noted in the operating agreement, each member was expected to "devote so much of its time and attention as is reasonably necessary and advisable to manage the affairs of the Company to the best advantage of the Company." (Doc. 198-3, at 17.) Although plaintiff Bartlett apparently made significantly more financial contributions to FVA, all members contributed capital contributions.

Plaintiffs had the right to inspect any FVA financial documents at any time and complete access to FVA's information. Plaintiffs argue that they needed access to the initial Foxfield Associates, LLC documents. Plaintiffs were not investors in the Foxfield Associates, LLC venture, but they suggest that banking entities and/or defendants defrauded them by failing to disclose information relevant to their purchase of the 9.16-acre tract of land. But as noted above, the Securities Exchange Act was not intended to provide a broad federal remedy for all fraud. If plaintiffs cannot show that their investments in FVA are securities as defined by the law for purposes of the Security Exchange Act, federal court is not the proper venue for addressing these claims. Plaintiffs provide no legal authority for their position. The court therefore limits its examination to the FVA agreement, and

plaintiffs had complete access to FVA's documents.  Plaintiffs complain that defendant Robben and bank executives misrepresented the financial prosperity of Foxfield Associates, LLC.  But plaintiffs do not suggest that they did not know there was an initial Foxfield Associates, LLC enterprise.  Knowing that an initial enterprise existed, it seems reasonable to the court that they might have demanded to see its financial records before buying in.  But such issues are not before the court.

If plaintiffs' investments in FVA had constituted securities under the Act, information about Foxfield Associates, LLC, defendant Robben and the lending institution's alleged actions in attempting to lure plaintiffs into making an investment in FVA and essentially assuming defendant Robben's debts, might have been relevant to the court's analysis of plaintiff's claims.  But because the court determines that the investments were not securities, the court does not reach the substance of any claim that defendants violated the Act.

### 4.  Plaintiffs' Investments Were Not Securities for Any Other Reason

Plaintiffs argue that their investments in FVA constitute securities for four additional reasons: because (1) the parties opted-in to the Uniform Commercial Code ("UCC")'s standards on securities transfers in the FVA operating agreement.  (Doc. 198-3, at 1); (2) plaintiffs' interests have the same characteristics as stocks and should therefore be considered securities; (3) the interests "can be reflected in certificates showing rights in a profit-sharing agreement" and are therefore securities (Doc. 198, at 29); and (4) plaintiff Bartlett's $400,000 note is presumed a security unless defendants can show that it bears a resemblance to a judicially-enumerated exception.  Plaintiffs suggest that defendants' failure to argue that plaintiffs' FVA investments are not "securities" for these four additional reasons should foreclose the possibility of the court granting summary judgment in defendants' favor.  The court disagrees.

The court views this as a more fundamental problem—plaintiffs' failure to adequately plead Count 9 in the pretrial order, and likely in previous pleadings.  Plaintiffs include no factual allegations supporting their argument that defendants violated the Securities Exchange Act.  The statement that defendant Robben violated sections 10(b) and 10(b)5 of the Securities Exchange Act of 1934, does not put defendant Robben on notice of the claims against him.  Defendant was unable to know based on this statement whether plaintiff was alleging that plaintiff Bartlett's loan to FVA was a "note" or that the LLC interests were "investment contracts."  An argument could be made that plaintiffs waived their right to recovery on Count 9 for failure to state a claim in the pretrial order.

Regardless, plaintiffs' arguments are unsupported by law or argument (in this set of briefing) and simply listing them as alternate theories (for the first time) is insufficient.  Defendants direct the court, should the court consider these arguments on the merits, to the briefing on plaintiffs' motion for summary judgment on the issue of whether BFREF and Pres's interests were securities—a separate set of briefs on a separate motion for summary judgment.  (Doc. 185.)  The court declines to do so and will decide these issues based on the briefing provided.  The parties collectively decided to file six separate motions for summary judgment in this case, dividing the issues.  Whether that was a strategy to sidestep the court's page-limits on motions, or some other litigation strategy—because six separate motions were filed, the court has the discretion to address them in the order that promotes judicial efficiency.

Even if the court decided plaintiffs' four additional arguments on the merits, the arguments would fail.

### a. Plaintiffs' Interests Are Not "Any Interest or Instrument Commonly Known as a 'Security'" Under the Securities Act

The Securities Act definition of "security" includes "any interest or instrument commonly known as a 'security.'"  15 U.S.C. § 77b(a)(1).  Plaintiffs argue that their investments in FVA are

"commonly known" to be securities because the UCC section titled "Rules for Determining Whether Certain Obligations and Interests Are Securities or Financial Assets."  This section states "An interest in a . . . limited liability company is not a security unless it is dealt in or traded on securities exchanges or in securities markets, its terms expressly provide that it is a security governed by this Article, or it is an investment company security."  UCC § 8-103.

Plaintiffs' investments do not fall under the definition of "security" under the Securities Exchange Act.  This does not allow them to try again with a new definition from a completely different statute.  Plaintiffs cite no authority suggesting that the UCC's definition of "security" may be substituted for the Security Exchange Act's definition, or even suggesting that any investment falling under the UCC's definition would constitute an instrument "commonly known" to be a security.  To the contrary, the plain language of the UCC's definition suggests that LLC interests typically are not securities, enumerating a few exceptions to that general rule.

Even if the court accepted plaintiff's argument that the UCC definition could establish instruments commonly understood to be securities, it is not clear that the FVA operating agreement would fall under the UCC definition.  It was not dealt or traded on a securities exchange or in a securities market.  It is not an investment company security.  But plaintiffs argue that the operating agreement, by its terms, expressly provides that it is governed by the UCC.

First, plaintiffs argue that the language of the operating agreement shows that its members intended it to be governed by the Securities Exchange Act.  The agreement says

> THE INTERESTS IN THIS COMPANY HAVE NOT BEEN REGISTERED UNDER
> THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER THE SECURITIES
> LAWS OF ANY STATE AND MAY NOT BE SOLD, TRANSFERRED OR
> OTHERWISE DISPOSED OF UNLESS REGISTERED UNDER THAT ACT AND
> THE APPLIACABLE STATE SECURITIES LAWS, OR THE COMPANY SHALL
> HAVE RECEIVED AN OPINION OF COUNSEL (WHICH COUNSEL AND
> OPINION SHALL BE SATISFACTOR TO THE COMPANY'S COUNSEL) THAT

REGISTRATION OF SUCH SECURITIES UNDER THAT ACT AND UNDER THE PROVISIONS OF APPLICABLE STATE SECURITIES LAWS IS NOT REQUIRED.

(Doc. 186-7, at 1.)  This at best, shows that if a member decided to transfer their interest, they should seek legal advice about which securities laws applied to the interest in order to comply with the law. This statement does not expressly provide that the interests in FVA are securities for the purposes of the UCC or Securities Exchange Act.  If the parties intended the agreement to be covered by the Securities Exchange Act they could have stated it, and they did not.

Second, plaintiffs suggest that the definition of "interest" in the operating agreement expressly provides that the FVA interests are governed by the UCC.  It states that "For purposes of the Uniform Transfer on Death Security Registration Act or any similar applicable legislation, an Interest in the Company shall be and is a "security" as defined in and governed by Article 8 of the Uniform Commercial Code."  (*Id.* at 4.)  Again, the court disagrees with plaintiffs' characterization of this language.  If anything, it limits the definition of the FVA Interests as "securities" to the Uniform Transfer on Death Security Registration Act.  It does not expressly say that the FVA interests should be governed by the UCC generally and it does not even mention the Securities Exchange Act.  The drafters could have expressly stated that the FVA interests should be considered securities for purposes of federal securities law.  They did not.

### b.  Plaintiffs' Interests Are Not "Stocks" Under the Act

Next, plaintiffs argue that their interests in FVA have similar characteristics as "stocks" and should therefore be considered "securities" under the Act.  The United States Supreme Court's decision in *Landreth Timber Co. v. Landreth*, explained when "stock" is covered by the Securities Exchange Act.  471 U.S. 681 (1985).  The Supreme Court explained that investment bearing the name "stock" is covered by the Securities Act if it also has the characteristics usually associated with common stock: "(i) the right to receive dividends contingent upon an apportionment of profits; (ii)

negotiability; (iii); the ability to be pledged or hypothecated; (iv) the conferring of voting rights in proportion to the number of shares owned; and (v) the capacity to appreciate in value." *Id.* at 686.  The Supreme Court noted that the definition of "securities" "includes both instruments whose names alone carry well-settled meaning [such as stocks], as well as instruments of more variable character [that] were necessarily designated by more descriptive terms such as investment contract." *Id.* 471 U.S. at 686.  The Court explained that if the Securities Act is to apply to unusual categories of investments, they must fall "within the usual concept of a security."

Here, plaintiffs ask the court to find that their investments are "like stock" in that they have the five characteristics of stock outlined in *Landreth Timber Co.*  But plaintiffs are misapplying the *Landreth* decision.  The Supreme Court noted that it was not enough for an investment to bear the name "stock." It must *also* have the characteristics.  Here, plaintiffs' investments were not called stock. They do not even meet the threshold requirement of bearing the label stock, so the court need not determine that they also have the characteristics of stock to qualify them as securities.

### c.  Plaintiffs' Investments Are Not Certificates of Interest or Participation in a Profit-sharing Agreement

Third, plaintiffs argue that the they could issue themselves "certificates of LLC interest" and that these papers should be considered "certificate[s] of interest or participation in any profit-sharing agreement" as listed in the definition of "securities" in the Act, relying primarily on the United States Supreme Court's decision in *Tcherepnin v. Knight*, 389 U.S. 332 (1967).  The court disagrees.

In determining that the withdrawable capital shares at issue in *Tcherepnin* were covered by the Act, the Supreme Court applied the test for whether an investment contract is a security.  The Court specifically relied on the fact that the plaintiffs in that case were dependent on the skill and efforts of others for the success of their investment.  This court already determined that under the investment contract analysis, the investments in this case were not securities because plaintiffs retained, at least

objectively, the ability to control their investments.  Plaintiffs' argument that they could hypothetically issue themselves "certificates of limited liability company interest" because nothing in the FVA operating agreement prohibits such action, does not convince the court that plaintiffs' interests were the types of investments Congress contemplated to be "securities" under the Act.

Likewise, the court is not persuaded by plaintiffs' argument that their investments could constitute securities because the investments could "answer to the name or description" of many of the items in the Act's definition of "security."  Plaintiffs' interests in FVA are not the type of interests that on their face seem to represent the very paradigm of a security—such as bonds or shares of stock. Even if they were, the Supreme Court has repeatedly shown that "bearing the label stock is not of itself sufficient to invoke the coverage of the Acts." *Landreth Timber Co.*, 471 U.S. at 686.  Courts must view the nature of the investment at issue and determine whether it is the type of investment Congress intended to cover.  This "catch-all" argument, without more, is insufficient to survive summary judgment.  Such an interpretation of the Act would run directly contrary to the Supreme Court's directive that, when "searching for the meaning and scope of the word 'security' in the Act, form should be disregarded for substance and the emphasis should be on the economic reality." *Tcherepnin*. 389 U.S. at 336.

### d.  Plaintiff Bartlett's $400,000 Note is Not a Security Under the Act

Finally, plaintiff Bartlett argues that his uncollateralized, unsecured $400,000 loan to FVA, half of which was not repaid, constitutes a note and should be considered a security under the Securities Exchange Act.  "[T]he phrase 'any note' [as it appears in the Securities Acts] should not be interpreted to mean literally 'any note,' but must be understood against the backdrop of what Congress was attempting to accomplish in enacting the Securities Acts." *Reves*, 494 U.S. at 63.  A note is presumed to be a security. *Id.* at 67.  This presumption may be rebutted by the "family resemblance" test set out

in *Reves*. *Id.* at 63–65.  Several categories of instruments that are generally considered "notes" but are not "securities" include:

> the note delivered in consumer financing, the note secured by a mortgage on a home, the short-term note secured by a lien on a small business or some of its assets, the note evidencing a 'character' loan to a bank customer, short-term notes secured by an assignment of accounts receivable, or a note which simply formalizes an open-account debt incurred in the ordinary course of business (particularly if, as in the case of the customer of a broker, it is collateralized).

*Id.* (quoting *Exch. Nat'l Bank of Chicago v. Touche Ross & Co.*, 544 F.2d 1126, 1138 (2d Cir. 1976)).

It may also be rebutted by arguing that another category of instruments should be added to the list by examining:

> the motivations that would prompt a reasonable seller and buyer to enter into [the transaction]; (2) the plan of distribution of the instrument, with an eye on whether it is an instrument in which there is common trading for speculation or investment; (3) the reasonable expectations of the investing public; and (4) whether some factor such as the existence of another regulatory scheme significantly reduces the risk of the instrument, thereby rendering application of the Securities Acts unnecessary.

*S.E.C. v. Thompson*, 732 F.3d 1151, 1160 (10th Cir. 2013) (quoting *Reves*, 494 U.S. at 66).

First, regarding Bartlett's motivations for making the loan, the Supreme Court in *Reves* noted that

> [i]f the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to generate, the instrument is likely to be a "security."  If the note is exchanged to facilitate the purchase and sale of a minor asset or consumer good, to correct for the seller's cash-flow difficulties, or to advance some other commercial or consumer purpose, on the other hand, the note is less sensibly described as a "security."

494 U.S. at 66.  Although standing alone, receiving an 8 percent return represents a good investment for Bartlett, and might indicate that the note was a security, the uncontested facts show that Bartlett's loan was intended to finance FVA's short-term cash-flow issues until the company could start selling lots.  The loan was intended to be repaid within a short time-frame.  And Bartlett's *primary* interest was in his new venture succeeding.  If the loan were made by an outside investor, the court would

more likely find the outside investor's motivation to be profit on the loan, rather than addressing cash-flow issues.  The court finds that this factor weighs in favor of the loan not resembling a note for purposes of the Securities Act.

Second, plaintiffs make no argument that the loan was a commonly traded instrument.  There is no evidence that a request for a loan was made to anyone but Bartlett.  Loans were not solicited from the public or even from anyone outside the FVA membership.  This factor weighs in favor of the loan not being considered a note.

Third, the court considers whether the loan would be viewed by objective purchasers as an investment.  As noted above, if an outside investor had offered to make FVA a loan, the court would likely consider the reasonable expectation of that investor to be profits.  But Bartlett was not an outside investor.  This factor weighs in favor of finding the loan a note under the Act.

Defendants concede the fourth element.  There was no other known regulatory scheme that would reduce the risk of plaintiff Bartlett's loan, rendering the protections of the Securities Act unnecessary.  Although this factor weighs in favor of the note being considered a security for purposes of the act, the elements as a whole suggest that it was not a note.

In sum, the court finds that on the very specific facts of this case, that plaintiffs' interests in FVA and the loan plaintiff Bartlett made to FVA are not "securities" as defined by the Securities Exchange Act.  The interests were not marketed beyond a very limited number of individuals; ultimately only BFREF and Pres split 50 percent interests.  Plaintiffs are not the type of inexperienced, uninformed investors the federal securities laws were enacted to protect.  They both had experience in real estate investments and had previously worked with defendants on other real estate ventures.  They were member investors who objectively granted themselves significant control over FVA through the operating agreement they signed.  Whether they subjectively intended, or did exercise that control is of

limited interest or import to the court's decision.  Plaintiffs chose defendant Robben to be FVA's president, thereby granting him the ability to run the day-to-day operations of the enterprise.  But the record does not indicate that he was so uniquely entrepreneurial that he could not have been replaced for the enterprise to continue.  Plaintiffs were not inexperienced, small investors completely relying on defendant Robben's management because of their own "lack of business knowledge, finances, or control over the operation."  *Fargo Partners v. Dain Corp.*, 540 F.2d 912, 915 (8th Cir. 1976).

For all these reasons, the court finds that the investments plaintiffs made in FVA were not securities for purposes of the Securities Exchange Act.  Defendants are therefore entitled to summary judgment on plaintiffs' sole federal claim as a matter of law.

### B. The Court Declines to Exercise Supplemental Jurisdiction Over Plaintiffs' Remaining 24 Counts

The sole issue remaining before the court is to decide whether this case should remain in federal court in the absence of federal claims.  The parties agree that there is no diversity jurisdiction because the parties are all citizens of Kansas.  (Doc. 198, at 5 n.1.)  If the court dismisses all claims over which it had original jurisdiction, 28 U.S.C. § 1367(c) provides that the court may decline to exercise supplemental jurisdiction over remaining state law claims.  Whether to try state claims in the absence of triable federal claim is discretionary, but the court should consider "the nature and extent of pretrial proceedings, judicial economy, convenience, and fairness" when deciding whether to retain jurisdiction.  *Anglemyer v. Hamilton Cnty. Hosp.*, 58 F.3d 533, 541 (10th Cir. 1995).

The pretrial proceedings in this case have taken some time due to lengthy stays pending the resolution of related state court actions.  Defendant Robben's bankruptcy case was also pending during discovery in this case, requiring further extensions.  These delays do not necessarily show that the nature or extent of pretrial proceedings warrants retaining the case in federal court when no federal

claims remain.  To the contrary, because there was a state court case in Johnson County with similar factual issues and claims, retaining the state claims might result in inconsistent findings of fact or law.

The current governing pleading is the pretrial order.  It contains 24 of the original 32 Counts, only one of which was a federal claim.  The clear majority of issues in this case were always state law claims and should properly be decided by a state court, especially now that the single federal claim is dismissed.  The court finds that the balance of factors favors dismissal.  The court declines to retain jurisdiction over the remaining claims.  This case is dismissed.

**IT IS THEREFORE ORDERED** that defendants' Motion for Summary Judgment on Plaintiff's Sole Federal Claim and Motion to Dismiss for Lack of Subject Matter Jurisdiction (Doc. 183) is granted.

**IT IS FURTHER ORDERED** that:

- Defendants' Motion Regarding Plaintiffs' Rebuttal Experts (Doc. 157)

- Defendants' Motion for Summary Judgment On Plaintiff's State Law Claims (Doc. 179)

- Defendants' Motion for Summary Judgment On Defendants' Affirmative Defenses (Doc 181)

- Plaintiffs Bartlett Family Real Estate Fund, LLC, Richard A. Bartlett, Foxfield Villa Associates, LLC, Pres, LLC, and Ernest J. Straub, III's Motion for Summary Judgment on Question of Whether PRES, LLC and Bartlett Family Real Estate Fund, LLC FVA Interests, and Bartlett's FVA Note are Securities (Doc. 185)

- Plaintiffs' Motion for Summary Judgment on Defendants' Mitigation of Damages and Statute of Limitations Affirmative Defenses (Doc. 187)

- Plaintiffs' Motion for Summary Judgment on Plaintiffs' Affirmative Claims (Doc. 189)

- Plaintiffs' Motion to Strike [201] Memorandum in Opposition to Motion, [202] Memorandum in Opposition to Motion, [199] Memorandum in Opposition to Motion, Exhibit A to Doc. 201, Exhibit B to Doc. 202, and Exhibit B to Doc. 199 (Doc. 208)

- Plaintiffs' Motion for Leave to file a Sur-reply in Opposition to Defendants' Motion for Summary Judgment on Plaintiffs' State Law Claims and Suggestions in Support (Doc. 215)

- Plaintiffs' Motion to Exclude and/or Strike Expert Evidence from Shawn D. Fox (Doc. 221) and

- Defendants' Motion to Exclude, Strike and/or Limit Testimony of Plaintiffs' Damages Expert (Doc. 223).

are denied as moot.

Dated February 26, 2018, at Kansas City, Kansas.


s/ Carlos Murguia
**CARLOS MURGUIA**
**United States District Judge**